162 F.3d 195
 47 ERC 1939, 29 Envtl. L. Rep. 20,405
 UNITED STATES of America, ex rel. Jonathan STEVENS, qui tam
and as relator, Plaintiff-Appellee,
United States of America, Intervenor,
v.
The STATE OF VERMONT AGENCY OF NATURAL RESOURCES, Defendant-Appellant.
 Docket No. 97-6141.
 United States Court of Appeals, Second Circuit.
 Argued Feb. 2, 1998.
Decided Dec. 7, 1998.
 
 Mark G. Hall, Burlington, Vermont (Stephen G. Norten, Paul, Frank & Collins, Burlington, Vermont, on the brief), for plaintiff-appellee Stevens.
 Douglas N. Letter, Appellate Litigation Counsel, Civil Division, United States Department of Justice, Washington, D.C. (Frank W. Hunger, Assistant Attorney General, Department of Justice, Washington, D.C., Charles R. Tetzlaff, United States Attorney for the District of Vermont, Burlington, Vermont, on the brief), for the United States of America as Intervenor.
 David M. Rocchio, Special Assistant Attorney General, Montpelier, Vermont (William H. Sorrell, Attorney General of the State of Vermont, Mark J. Di Stefano, Ronald A. Shems, Rebecca M. Ellis, Assistant Attorneys General, Montpelier, Vermont, on the brief), for defendant-appellant.
 Howard L. Zwickel, Assistant Attorney General, Albany, New York (Dennis C. Vacco, Attorney General of the State of New York, Barbara G. Billet, Solicitor General, Nancy A. Spiegel, Assistant Attorney General, Albany, New York; Bruce M. Botelho, Attorney General, State of Alaska, Susan D. Cox, Juneau, Alaska; Grant Woods, Attorney General, State of Arizona, Tim Delaney, Phoenix, Arizona; Daniel E. Lungren, Attorney General, State of California, Thomas F. Gede, Sacramento, California; Gale A. Norton, Attorney General, State of Colorado, Richard A. Westfall, Denver, Colorado; Richard Blumenthal, Attorney General, State of Connecticut, Jane S. Scholl, Hartford, Connecticut; M. Jane Brady, Attorney General, State of Delaware, Michael J. Rich, Wilmington, Delaware; Margery S. Bronster, Attorney General, State of Hawaii, Girard D. Lau, Honolulu, Hawaii; Alan G. Lance, Attorney General, State of Idaho, David L. Hennessey, Boise, Idaho; James E. Ryan, Attorney General, State of Illinois, Barbara Preiner, Chicago, Illinois; Thomas J. Miller, Attorney General, State of Iowa, Elizabeth M. Osenbaugh, Des Moines, Iowa; Carla J. Stovall, Attorney General, State of Kansas, John W. Campbell, Topeka, Kansas; Andrew Ketterer, Attorney General, State of Maine, Thomas D. Warren, Augusta, Maine; J. Joseph Curran, Jr., Attorney General, State of Maryland, Andrew H. Baida, Baltimore, Maryland; Frank J. Kelley, Attorney General, State of Michigan, Thomas L. Casey, Lansing, Michigan; Mike Moore, Attorney General, State of Mississippi, James F. Steel, Jackson, Mississippi; Joseph P. Mazurek, Attorney General, State of Montana, Clay R. Smith, Helena, Montana; Frankie Sue Del Papa, Attorney General, State of Nevada, Anne Cathcart, Carson City, Nevada; Philip T. McLaughlin, Attorney General, State of New Hampshire, Steven M. Houran, Concord, New Hampshire; Michael F. Easley, Attorney General, State of North Carolina, Andrew A. Vanore, Jr., Raleigh, North Carolina; Betty D. Montgomery, Attorney General, State of Ohio, Simon B. Karas, Columbus, Ohio; W.A. Drew Edmonson, Attorney General, State of Oklahoma, Victor N. Bird, Oklahoma City, Oklahoma; Dan Morales, Attorney General, State of Texas, Javier P. Guajardo, Jr., Austin, Texas; Jan Graham, Attorney General, State of Utah, Annina M. Mitchell, Salt Lake City, Utah; Richard Cullen, Attorney General, Commonwealth of Virginia, Frank S. Ferguson, Richmond, Virginia; Darrell V. McGraw, Jr., Attorney General, State of West Virginia, Silas B. Taylor, Charleston, West Virginia, on the brief), for Amici Curiae States of New York, Alaska, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Mississippi, Montana, Nevada, New Hampshire, North Carolina, Ohio, Oklahoma, Texas, Utah, West Virginia, and the Commonwealth of Virginia, in support of defendant-appellant.
 Mark B. Rotenberg, General Counsel, University of Minnesota, Minneapolis, Minnesota (Mark A. Bohnhorst, Associate General Counsel, Minneapolis, Minnesota; James E. Holst, General Counsel, University of California, John F. Lundberg, Christopher M. Patti, Oakland, California; Elizabeth M. Barry, Co-Interim General Counsel, University of Michigan, Ann Arbor, Michigan; C. Peter Magrath, President, National Association of State Universities and Land-Grant Colleges, Washington, D.C.), filed a brief on behalf of Amici Curiae Regents of the University of Minnesota, Regents of the University of California, Regents of the University of Michigan, and the National Association of State Universities and Land-Grant Colleges, supporting reversal.
 Frederick Robinson, Washington, D.C. (Christine P. Hsu, Fulbright & Jaworski, Washington, D.C., David C. Birdoff, Fulbright & Jaworski, New York, New York; Joseph A. Keyes, Jr., Washington, D.C.; Sheldon E. Steinbach, Washington, D.C.), filed a brief on behalf of Amici Curiae Association of American Medical Colleges and American Council on Education, supporting reversal.
 Priscilla R. Budeiri, Washington, D.C. (Gary W. Thompson, Lisa R. Hovelson, Alan Shusterman, Washington, D.C.), filed a brief on behalf of Amicus Curiae Taxpayers Against Fraud, The False Claims Act Legal Center, in support of plaintiff-appellee.
 Before: KEARSE and WALKER, Circuit Judges, and WEINSTEIN, District Judge*.
 KEARSE, Circuit Judge.
 
 
 1
 Defendant State of Vermont Agency of Natural Resources (the "Agency" or the "State") appeals from an order of the United States District Court for the District of Vermont, J. Garvan Murtha, Chief Judge, denying the State's motion to dismiss the present qui tam suit brought by Jonathan Stevens on behalf of the United States under the False Claims Act, 31 U.S.C. § 3729 et seq. (1994) ("FCA" or the "Act"), for lack of subject matter jurisdiction. The district court ruled that the State is a "person" within the meaning of § 3729(a) and is thus subject to suit under the Act, and that such suits are not barred by the Eleventh Amendment. The State challenges these rulings on appeal. For the reasons set forth below, we affirm.
 
 I. BACKGROUND
 
 2
 At all relevant times, the Agency was a recipient of federal funds, and Stevens was an employee of the Agency. Stevens commenced this action as a qui tam suit under the FCA for himself and the United States, alleging that the Agency had made fraudulent claims against the United States. The allegations of the complaint, taken as true for purposes of the State's motion to dismiss, include the following.
 
 A. The Complaint
 
 3
 The Agency, through its Department of Environmental Conservation ("DEC") and a DEC subdivision called the Water Supply Division ("WSD"), was the recipient of a series of federal grants administered by the United States Environmental Protection Agency ("EPA") under, inter alia, the Clean Water Act, 33 U.S.C. § 1251 et seq., and the Safe Drinking Water Act, 42 U.S.C. § 300f et seq. These grants, which substantially funded WSD's budget, provided federal funds to pay for, inter alia, salary expenses for work performed by WSD employees in connection with the grants.
 
 
 4
 As a recipient of these funds, the Agency was subject to certain reporting requirements, including the requirement that it submit time and attendance records reflecting the hours actually worked and the work actually performed by the pertinent individual employees. The complaint alleges that DEC instead made advance estimates of the federal-grant-attributable time to be worked by individual WSD employees in a given federal fiscal year and instructed those employees to fill out their biweekly reports, purporting to show actual work done, to match DEC's estimates, regardless of the time actually worked: "[e]mployees of ... DEC did not work the hours which were arbitrarily assigned to them, nor did they record the hours they actually worked" (Complaint p 36).
 
 
 5
 The complaint alleges that the Agency thus "knowingly and continuously submitted false claims to EPA for salary and wage expenses of its employees purporting to show that employees were working on federally-funded projects when, in fact, they were not working the hours as reported." (Id. p 39.) This allowed the Agency to retain funds to which it was not entitled for a given year. In addition, because DEC reported each year that all of the federal grant moneys received had been properly used, and proceeded to submit new grant requests using estimates based on the previous year's reported spending level, the false reports for a given year enabled the Agency to maintain or increase its funding in each succeeding fiscal year.
 
 
 6
 Stevens and other DEC employees complained to their supervisors that the biweekly reports that DEC instructed the employees to fill out were not accurate and that the reported hours were not being worked. Management instructed them to continue in accordance with DEC's prior instructions. The complaint also alleges, on information and belief, that a similar course of action was followed in several DEC subdivisions other than WSD.
 
 
 7
 Stevens commenced the present suit in May 1995. As required by the Act, see Part II.A. below, he filed the complaint in camera and under seal, without serving it on the State, and served a copy, together with material evidence supporting it, on the United States (the "government") in order to allow the government to investigate the allegations and to decide whether it wished to intervene. In June 1996, having sought and received several extensions of time in which to make that decision, the government filed notice that it declined to intervene. It requested, however, that it be served with copies of all pleadings filed in the case; it reserved the right to order transcripts of depositions; and it expressly reserved the right to intervene against the State, for good cause shown, at a later time. The government also requested that it be given notice and an opportunity to be heard in the event that Stevens or the State sought to have the action dismissed, settled, or otherwise discontinued.
 
 
 8
 In July 1996, the district court ordered that the complaint be unsealed and served on the State.
 
 
 9
 B. The Denial of the State's Motion To Dismiss
 
 
 10
 In March 1997, the State moved to dismiss the complaint for lack of jurisdiction, contending (1) that states and their instrumentalities (collectively "States") are not "person[s]" under § 3729(a) who are subjected to suit or liability by the terms of the Act, and (2) that, in any event, the imposition of such liability on the States would violate the Eleventh Amendment. Stevens opposed the motion and was supported by the United States as amicus curiae.
 
 
 11
 In an Order dated May 9, 1997 ("Order"), the district court denied the motion to dismiss. The court rejected the State's contention that the Act does not make States "person[s]" who are subject to liability under the Act, noting that States have considered themselves "persons" within the meaning of the Act in order to bring suits as qui tam plaintiffs, and pointing out that, as a matter of statutory construction, identical words used in different parts of the same statute should normally be accorded the same meaning. The court stated that
 
 
 12
 it would be anomalous to acknowledge that a state is a "person" within the meaning of the statute if it chooses to bring a False Claims Act suit, but that the same state is not a "person" if named as a defendant.
 
 
 13
 Order at 2. The court rejected the State's claim of Eleventh Amendment immunity on the ground that that Amendment does not bar suits against the States by the United States itself, and that the United States "is the real party in interest and ultimately the primary beneficiary of a successful qui tam action." Id. at 1.
 
 
 14
 The State has appealed, see generally Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (district court order denying motion to dismiss on ground of Eleventh Amendment immunity is immediately appealable), and proceedings in the district court have been stayed pending appeal.
 
 II. DISCUSSION
 
 15
 On appeal, the State contends (1) that Congress did not intend to subject States to suit or liability under the FCA, and (2) that to the extent that the Act is construed to permit qui tam suits against the States, the Act violates the immunity conferred on the States by the Eleventh Amendment. The United States, which declined to intervene in the suit in the district court, has intervened in this appeal pursuant to 28 U.S.C. §§ 517 and 2403(a) (1994) to support the decision of the district court.
 
 
 16
 A. The Scope and Qui Tam Provisions of the Act
 
 
 17
 The FCA imposes civil liability on "[a]ny person" who makes a false monetary claim to the United States government. 31 U.S.C. § 3729(a). Such a person is liable to the government for treble damages plus a $5,000-$10,000 civil penalty:
 
 
 18
 (a) Liability for certain acts. Any person who--
 
 
 19
 (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval;(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
 
 
 20
 (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; [or]
 
 
 21
 ....
 
 
 22
 (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
 
 
 23
 is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....
 
 
 24
 31 U.S.C. § 3729(a). The Act does not define the term "person."
 
 
 25
 The Act permits the Attorney General of the United States to bring a civil suit against "the person" who has violated § 3729(a). See 31 U.S.C. § 3730(a). It also permits a qui tam suit to be brought by "[a] person" as follows:
 
 
 26
 Actions by Private Persons--(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government.
 
 
 27
 31 U.S.C. § 3730(b)(1). If a qui tam action has been brought, the United States must be given an opportunity to intervene and take control of the action. The Act requires that the complaint filed by a qui tam plaintiff (or "relator") be kept under seal, without service on the defendant, for at least 60 days, id. §§ 3730(b)(2), (3), and that the government be provided with a copy of the complaint and "written disclosure of substantially all material evidence and information the person possesses," id. § 3730(b)(2), in order to permit the government to decide whether to intervene at the outset. See United States ex rel. Pilon v. Martin Marietta Corp., 60 F.3d 995, 998-999 (2d Cir.1995); S.Rep. No. 99-345, at 24 (1986) ("Senate Report" or "Report"), reprinted in 1986 U.S.C.C.A.N. 5266, 5289 (sealing provision "is intended to allow the Government an adequate opportunity to fully evaluate the private enforcement suit and determine ... whether it is in the Government's interest to intervene and take over the civil action"). Failure to comply with these mandatory threshold requirements warrants dismissal of the qui tam complaint with prejudice, which bars the qui tam plaintiff from refiling such a suit, but leaves the government free to bring suit on its own. See, e.g., United States ex rel. Pilon v. Martin Marietta Corp., 60 F.3d at 999-1000 & n. 6.
 
 
 28
 Even if the government elects not to intervene at the outset, it may intervene upon a showing of good cause at any time thereafter. See 31 U.S.C. § 3730(c)(3). Good cause has been found to exist upon a showing, for example, of the government's realization that the alleged frauds were of greater magnitude than originally believed, see, e.g., United States ex rel. Hall v. Schwartzman, 887 F.Supp. 60, 62 (E.D.N.Y.1995), the government's receipt of additional evidence through a related civil trial, see, e.g., United States ex rel. Stone v. Rockwell International Corp., 950 F.Supp. 1046, 1048-49 (D.Colo.1996), or the government's collateral concern that prosecution of the qui tam action could impede government efforts to achieve peace in the relevant industry, see, e.g., United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp., 151 F.3d 1139, 1142 (9th Cir.1998).
 
 
 29
 If the government intervenes, it thereby takes control of the suit, see, e.g., 31 U.S.C. § 3730(b)(4)(A) ("the action shall be conducted by the Government"), and has "primary responsibility for prosecuting the action," id. § 3730(c)(1). The qui tam relator is allowed to continue to participate in the action, although the court, at the urging of either the government or the defendant, may limit the qui tam relator's role in the litigation upon a showing, for example, that his unrestricted participation would be for purposes of harassment. Id. § 3730(c)(2)(C), (D). In addition, the government may ask the court to limit the qui tam relator's participation on other grounds, such as undue interference with or delay of the government's prosecution of the case. Id. § 3730(c)(2)(C). The government is not bound by any act of the qui tam plaintiff. See id. § 3730(c)(1).
 
 
 30
 Moreover, the government has substantial authority to terminate the suit, even over the objection of the qui tam relator. For example,
 
 
 31
 [t]he Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances.
 
 
 32
 Id. § 3730(c)(2)(B). Further,
 
 
 33
 [t]he Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.
 
 
 34
 Id. § 3730(c)(2)(A). The government is thus given ample authority, whether through settlement or dismissal, to bring the litigation to an early end, and although the qui tam plaintiff must be given a hearing, the court need not, in order to dismiss, determine that the government's decision is reasonable. See, e.g., United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp., 151 F.3d at 1145 (in light of Separation of Powers concerns, district court need find only that the government's decision to dismiss a qui tam suit, even a meritorious one, is supported by a "valid governmental purpose" that is not arbitrary or irrational and has some "rational relation" to the dismissal).
 
 
 35
 If the United States chooses not to intervene, which gives the qui tam plaintiff "the right to conduct the action," 31 U.S.C. § 3730(b)(4)(B); id. § 3730(c)(3), the government nonetheless retains significant control over the action. No other person may intervene. See 31 U.S.C. § 3730(b)(5). The government is entitled to monitor the proceedings, see id. § 3730(c)(3) (government may require service of copies of all pleadings and deposition transcripts); it is entitled to have discovery stayed if discovery would interfere with its investigation or prosecution of a criminal or civil suit arising out of the same facts, see id. § 3730(c)(4); and, as indicated above, it retains the right to intervene at any time for good cause, see id. § 3730(c)(3). Further, the qui tam "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." Id. § 3730(b)(1).
 
 
 36
 Any recovery in a qui tam action, whether or not the government intervenes, belongs principally to the United States. The qui tam relator will generally be entitled to receive a share of the government's recovery, which ranges from 15 to 25 percent if the United States has intervened, see id. § 3730(d)(1), or from 25 to 30 percent if it has not, see id. § 3730(d)(2). The qui tam relator's award is paid only from "the proceeds" of the suit, id. §§ 3730(d)(1), (2), which may consist of an adjudicated amount or a settlement amount. Thus, 70 to 85 percent of the proceeds recovered in a qui tam suit belongs to the United States.
 
 B. The Eleventh Amendment Defense
 
 37
 The Eleventh Amendment provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although the terms of the Amendment, which embody the principle of sovereign immunity, refer only to suits against a state by persons who are not citizens of that state, it is clear that, unless the state has given its consent, the Amendment also bars a suit against the state by its own citizens, see Hans v. Louisiana, 134 U.S. 1, 10-11, 10 S.Ct. 504, 33 L.Ed. 842 (1890), as well as suits by a foreign nation, see Monaco v. Mississippi, 292 U.S. 313, 330-32, 54 S.Ct. 745, 78 L.Ed. 1282 (1934), or by an Indian tribe, see Blatchford v. Native Village of Noatak, 501 U.S. 775, 782, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).
 
 
 38
 As against the United States, however, States have no sovereign immunity. See, e.g., West Virginia v. United States, 479 U.S. 305, 311, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); United States v. Texas, 143 U.S. 621, 644-46, 12 S.Ct. 488, 36 L.Ed. 285 (1892). When the States, in framing and adopting the Constitution, agreed to create a federal government "established for the common and equal benefit of the people of all the States," id. at 646, 12 S.Ct. 488, they necessarily recognized that the privilege of immunity would be inconsistent with that government's paramount sovereignty. A permanent waiver of the States' immunity from suit by the United States is "inherent in the constitutional plan." Monaco v. Mississippi, 292 U.S. at 329, 54 S.Ct. 745; see Blatchford v. Native Village of Noatak, 501 U.S. at 781-82, 111 S.Ct. 2578; United States v. Minnesota, 270 U.S. 181, 195, 46 S.Ct. 298, 70 L.Ed. 539 (1926) ("[o]f course the immunity of the State is subject to the constitutional qualification that she may be sued ... by the United States"); United States v. Texas, 143 U.S. at 646, 12 S.Ct. 488. In sum, "nothing in [the Eleventh Amendment] or in any other provision of the Constitution prevents or has ever been seriously supposed to prevent a State's being sued by the United States." United States v. Mississippi, 380 U.S. 128, 140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); see also Seminole Tribe v. Florida, 517 U.S. 44, 71 n. 14, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("the Federal Government can bring suit in federal court against a State").
 
 
 39
 The question for the present case is whether a qui tam suit under the FCA should be viewed as a private action by an individual, and hence barred by the Eleventh Amendment, or one brought by the United States, and hence not barred. The interests to be vindicated, in combination with the government's ability to control the conduct and duration of the qui tam suit, persuade us that the Eleventh Amendment does not bar such a suit.
 
 
 40
 The real party in interest in a qui tam suit is the United States. All of the acts that make a person liable under § 3729(a) focus on the use of fraud to secure payment from the government. It is the government that has been injured by the presentation of such claims; it is in the government's name that the action must be brought; it is the government's injury that provides the measure for the damages that are to be trebled; and it is the government that must receive the lion's share--at least 70%--of any recovery. To be sure, the qui tam plaintiff has an interest in the action's outcome, but his interest is less like that of a party than that of an attorney working for a contingent fee. See, e.g., Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, ----, 117 S.Ct. 1871, 1877, 138 L.Ed.2d 135 (1997) (qui tam plaintiff is ordinarily "motivated primarily by prospects of monetary reward rather than the public good"); United States ex rel. Marcus v. Hess, 317 U.S. 537, 541 n. 5, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (qui tam plaintiffs act "under the strong stimulus of personal ill will or the hope of gain" (internal quotation marks omitted)). Qui tam claims simply do not seek the vindication of a right belonging to the private plaintiff, and if there has been no injury to the United States, the qui tam plaintiff cannot recover.
 
 
 41
 In sum, "although qui tam actions allow individual citizens to initiate enforcement against wrongdoers who cause injury to the public at large, the Government remains the real party in interest in any such action." Minotti v. Lensink, 895 F.2d 100, 104 (2d Cir.1990). Accord United States ex rel. Rodgers v. Arkansas, 154 F.3d 865, 868 (8th Cir.1998); United States ex rel. Killingsworth v. Northrop Corp., 25 F.3d 715, 720 (9th Cir.1994); United States ex rel. Milam v. University of Texas, 961 F.2d 46, 50 (4th Cir.1992) ("United States is the real party in interest in any False Claims Act suit, even where it permits a qui tam relator to pursue the action on its behalf").
 
 
 42
 Further, as described in Part II.A., the government has the right to control the action. If it wishes to intervene in the action at the outset, the qui tam plaintiff cannot prevent it from doing so. Whether or not the government intervenes, it has the right to be kept abreast of discovery in the qui tam suit and the right to prevent that discovery from interfering with its investigation or pursuit of a criminal or civil suit arising out of the same facts. If the government intervenes, it takes control of the lawsuit; it may have the participation of the qui tam plaintiff limited; and it is not bound by any act of the qui tam plaintiff. The government has both the right to prevent a dismissal sought by the qui tam plaintiff and the right to cause the action to be dismissed for any rational governmental reason, notwithstanding the qui tam plaintiff's desire that it continue.
 
 
 43
 In light of the fact that qui tam claims are designed to remedy only wrongs done to the United States, and in light of the substantial control that the government is entitled to exercise over such suits, we conclude that such a suit is in essence a suit by the United States and hence is not barred by the Eleventh Amendment. Accord United States ex rel. Rodgers v. Arkansas, 154 F.3d at 868; United States ex rel. Berge v. Board of Trustees of the University of Alabama, 104 F.3d 1453, 1458-59 (4th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 301, 139 L.Ed.2d 232 (1997); United States ex rel. Fine v. Chevron, U.S.A., Inc., 39 F.3d 957, 962-63 (9th Cir.1994), vacated on other grounds, 72 F.3d 740 (9th Cir.1995) (en banc ), cert. denied, 517 U.S. 1233, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996); United States ex rel. Milam v. University of Texas, 961 F.2d at 50.
 
 
 44
 The State's reliance on Blatchford v. Native Village of Noatak, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686, for the contrary proposition is misplaced. In that case, Native American tribes sued the State of Alaska, arguing that they should be allowed to bring such a suit because the United States is empowered to bring a suit for the benefit of the tribes. Plainly in those circumstances, however, the injury to be remedied was one to the tribes, not to the federal government, and the cause of action did not belong to the government. The Supreme Court's rejection of the contention that the tribes should be allowed to pursue their own rights in suits against the States does not persuade us that the United States may not authorize a person other than the Attorney General to bring suit against the States on behalf of the United States to assist the United States in recovering moneys of which it has been defrauded.
 
 
 45
 We thus turn to the remaining question, over which we exercise pendent appellate jurisdiction, of whether qui tam suits against the States are authorized by the Act.
 
 
 46
 C. Applicability of the False Claims Act to the States
 
 
 47
 The question is whether "person" in § 3729(a), the section imposing liability, includes States. At the outset, we note the State's contention that we should apply the "plain statement" rule and decline to construe § 3729(a) as exposing the States to liability absent the clearest of legislative statements that that was Congress's intent. We reject this contention.
 
 
 48
 The "plain statement" rule is that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); see id. at 349 n. 16, 92 S.Ct. 515 (collecting cases). The Supreme Court has never held that this principle is applicable in every instance in which it is argued that a statute imposes liability on the States. Cf. Hilton v. South Carolina Public Railways Commission, 502 U.S. 197, 205, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (refusing to adopt a "per se rule prohibiting the interpretation of general liability language to include the States, absent a clear statement by Congress to the effect that Congress intends to subject the States to the cause of action"). Rather, the Court has applied the plain statement rule only when the effect of the statute would be to intrude on the States' traditional authority and "upset the usual constitutional balance of federal and state powers." Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The rule has thus been applied to such questions as whether, in enacting a criminal statute, Congress meant to "render[ ] traditionally local criminal conduct a matter for federal enforcement and ... dramatically intrude[ ] upon traditional state criminal jurisdiction," United States v. Bass, 404 U.S. at 350, 92 S.Ct. 515; or whether, in passing the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010, Congress intended to impose an affirmative obligation on the States to provide certain kinds of treatment to the disabled, see, e.g., Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 16-17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); or whether, in passing the Age Discrimination in Employment Act, Congress meant to override the States' traditional authority to "determine the qualifications of their most important government officials," Gregory v. Ashcroft, 501 U.S. at 463, 111 S.Ct. 2395. The plain statement rule has not been applied to legislation that does not interfere with traditional state authority, such as an Internal Revenue Code provision allowing the Commissioner of Internal Revenue to require a state official to honor a levy on the salary of a state employee who is delinquent in payment of his federal taxes, see Sims v. United States, 359 U.S. 108, 112-13, 79 S.Ct. 641, 3 L.Ed.2d 667 (1959). See also Reich v. New York, 3 F.3d 581, 589-90 (2d Cir.1993) (requirement that state pay overtime to state law enforcement officials under the Fair Labor Standards Act did not so alter the federal-state balance as to require a clear statement), cert. denied, 510 U.S. 1163, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994), overruled by implication on other grounds by Seminole Tribe v. Florida, 517 U.S. at 59-66, 116 S.Ct. 1114.
 
 
 49
 In the FCA, we see no alteration of "the usual constitutional balance of federal and state powers" such as to require application of the plain statement rule. The Act does not intrude into any area of traditional state power. The goal of the statute is simply to remedy and deter procurement of federal funds by means of fraud. The States have no right or authority, traditional or otherwise, to engage in such conduct. Accordingly, we reject the State's contention that the plain statement rule applies, and we turn to the question of the proper interpretation of the FCA using the usual standards of statutory construction.
 
 
 50
 Under the usual standards, although "in common usage[ ] the term 'person' does not include the sovereign, ... there is no hard and fast rule of exclusion." United States v. Cooper Corp., 312 U.S. 600, 604-05, 61 S.Ct. 742, 85 L.Ed. 1071 (1941). "Whether the term 'person' when used in a federal statute includes a State cannot be abstractly declared, but depends upon its legislative environment." Sims v. United States, 359 U.S. at 112, 79 S.Ct. 641; see Georgia v. Evans, 316 U.S. 159, 161, 62 S.Ct. 972, 86 L.Ed. 1346 (1942). "The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate an intent, by the use of the term, to bring [a] state ... within the scope of the law." United States v. Cooper Corp., 312 U.S. at 605, 61 S.Ct. 742.
 
 
 51
 In the FCA, the principal uses of the term "person" are found in 31 U.S.C. §§ 3729 and 3730, which provide that "[a]ny person" is liable for making false claim, id. § 3729(a); that the Attorney General may bring a civil action "against the person," id. § 3730(a); and that "[a] person" may bring a qui tam action, id. § 3730(b)(1). Thus, the same term is used to categorize both those who may sue and those who may be sued, whether by the government itself or by a qui tam plaintiff.
 
 
 52
 In a number of instances, States have brought suits under the FCA as qui tam plaintiffs, clearly indicating that they viewed themselves as "person[s]" within the meaning of § 3730(b)(1). See, e.g., United States ex rel. Woodard v. Country View Care Center, Inc., 797 F.2d 888 (10th Cir.1986); United States ex rel. Wisconsin v. Dean, 729 F.2d 1100 (7th Cir.1984); United States ex rel. Hartigan and State of Illinois v. Palumbo Bros., Inc., 797 F.Supp. 624 (N.D.Ill.1992). That view clearly was also shared by Congress. For example, in discussing a bill to amend the Act in 1986, the Senate Report cited the decision in United States ex rel. Wisconsin v. Dean, 729 F.2d 1100, in which the Seventh Circuit had refused to allow the State of Wisconsin to act as a qui tam relator in a Medicaid fraud action, ruling that the court lacked jurisdiction over such a suit because the United States already possessed the information on which the suit was premised, even though the information had been unearthed solely by the State of Wisconsin. See Senate Report at 12-13, reprinted in 1986 U.S.C.C.A.N. at 5277-78. The Report cited the case with disapproval because of the jurisdictional limitation read into the statute by the court of appeals, and the 1986 amendments added provisions specifying that qui tam suits could be brought even on the basis of already-disclosed information so long as the qui tam plaintiff was the original source of the information, see 31 U.S.C. §§ 3730(e)(4)(A), (B). These provisions were added at the prompting of the National Association of Attorneys General, which had pointed out that it unnecessarily inhibited the detection and prosecution of fraud on the federal government "to prohibit sovereign states from becoming qui tam plaintiffs because the U.S. Government was in possession of information provided to it by the State." Senate Report at 13, reprinted in 1986 U.S.C.C.A.N. at 5278 (internal quotation marks omitted). The only controversy sparked by United States ex rel. Wisconsin v. Dean and resolved by these new sections was the status of the information on which a qui tam suit could properly be brought; there was no question whatever that qui tam suits could be brought by the States.
 
 
 53
 Further confirmation that Congress viewed the States as persons who could be qui tam plaintiffs may be found in another 1986 amendment, which permits the joinder, in an FCA suit, of related state-law claims where those claims are "for the recovery of funds paid by a State." 31 U.S.C. § 3732(b). The amendment was adopted "in response to comments from the National Association of Attorneys General," Senate Report at 16, reprinted in 1986 U.S.C.C.A.N. at 5281; presumably it is the State, and not a private party, that would have the right to recover such funds. The Report described the new section as "allowing State and local governments to join State law actions with False Claims Act actions brought in Federal district court if such actions grow out of the same transaction or occurrence." Id., reprinted in 1986 U.S.C.C.A.N. at 5281. Since intervention, other than by the government, is not allowed in a qui tam suit, Congress's provision for joinder of claims of a State must have been premised on the view that the State may be the qui tam plaintiff.
 
 
 54
 We thus think it plain that the States are "person[ ]s" within the meaning of § 3730(b)(1). Absent some indication to the contrary, we normally infer that in using the same word in more than one section of a statute--or indeed twice within the same section, as in subsections (a) and (b) of § 3730--Congress meant the word to have the same meaning. See, e.g., Commissioner v. Lundy, 516 U.S. 235, 250, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996); Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990); Sorenson v. Secretary of Treasury, 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986). We see nothing in the language of the FCA to indicate that Congress intended that States would be "person[s]" within the meaning of § 3730(b)(1) but not "person[s]" within the meaning of § 3729(a) or § 3730(a).
 
 
 55
 Nor do we see any such indication in the legislative history. The FCA has its origin in a 1863 statute entitled "An Act to prevent and punish Frauds upon the Government of the United States," March 2, 1863, ch. 67, § 3, 12 Stat. 696 (1863) ("1863 Act"). The 1863 Act similarly used the term "person" to designate both those who could be found liable under the law and those who could bring suit on behalf of the government. See id. §§ 3, 4. With respect to false monetary claims made to the United States, the 1863 Act imposed both criminal and civil liability on "any person in the land or naval forces of the United States," 1863 Act, § 1, and on "any person not in the military or naval forces," id. § 3. The 1863 Act provided that a qui tam suit could be brought "by any person," against "the person doing or committing" the forbidden fraudulent act. Id. § 4.
 
 
 56
 At first glance, the 1863 Act's references to persons "not in the military" might seem to bespeak an intention to encompass only natural persons, since only natural persons are capable of serving in the armed forces. But the legislative history of the statute seems to the contrary. The impetus for enactment of the 1863 Act was "stopping the massive frauds perpetrated by large contractors during the Civil War." United States v. Bornstein, 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976); see, e.g., Senate Report at 8, reprinted in 1986 U.S.C.C.A.N. at 5273 ("The False Claims Act was adopted in 1863 and signed into law by President Abraham Lincoln in order to combat rampant fraud in Civil War defense contracts."). This was the theme of the statements of Senator Howard, sponsor of a predecessor of the bill that became the 1863 Act. See Cong. Globe, 37th Cong., 3d Sess. 952 (1863) ("[t]he country ... has been full of complaints respecting the frauds and corruptions practiced in obtaining pay from the Government during the present war" by "persons who are contractors, or who are employed to contract for ships, vessels, steamers, watercraft, ordnance, arms, munitions of war, & c."); id. at 955 ("some frauds of a very gross character have already been practiced in the purchase and furnishing of small arms for the use of the Army. Arms have been supplied which, on examination and use, have turned out to be useless and valueless"); and id. at 957 (decrying "the enormous and flagrant frauds connected with the military service which are perpetually practiced upon the Treasury").
 
 
 57
 Further, among the concerns of Congress at that time were instances of fraud by state officials in the procurement of military supplies for state troops, the costs of which were ultimately borne by the United States. See Government Contracts, H.R.Rep. No. 37-2, pt. ii-a (1862). This House of Representative report stated that "testimony ha[d] been taken by the committee bearing directly on the purchase of miliary supplies by the State of Indiana"; that "[t]estimony of the same character ha[d] been taken in reference to the States of Ohio, New York, and Illinois"; and that the hearings had revealed an "unpardonable eagerness" on the part of state officials to engage in "fraud and peculation" in connection with "large and lucrative government contracts" for supplies for state troops, a subject of federal concern because "the general government ha[d] assumed the liabilities incurred by the several States in furnishing supplies for their respective troops." Id. at XXXVIII, XXXIX. Although this report did not mention any pending proposal for a false-claims act, it is difficult to suppose that when Congress considered the bills leading to the 1863 Act a year later it either meant to exclude the States from the "persons" who were to be liable for presentation of false claims to the federal government or had forgotten the results of this extensive investigation.
 
 
 58
 It is against this background that the 1863 Act, designed to reach procurement officers, "contractors[,] and the agents of contractors," Cong. Globe, 37th Cong., 3d Sess. at 955, imposed liability on all persons in the military and all persons not in the military. These provisions, in combination, are all-encompassing, and we see no indication that Congress meant to carve out any safe haven for frauds perpetrated by the States.
 
 
 59
 Given the scope of the language used, the statute's purpose has been described as "broadly to protect the funds and property of the Government from fraudulent claims." Rainwater v. United States, 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958); see also United States ex rel. Marcus v. Hess, 317 U.S. at 541 n. 5, 63 S.Ct. 379 (goal of the FCA is "remedial," "to protect the Treasury" (internal quotation marks omitted)). In interpreting the Act broadly in 1968, and concluding that an application for a federal agency loan is a "claim" within the meaning of the Act, the Supreme Court noted that
 
 
 60
 [t]he original False Claims Act was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War. Debates at the time suggest that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.
 
 
 61
 United States v. Neifert-White Co., 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968).
 
 
 62
 The 1863 Act was codified as part of Title 31 of the United States Code in 1943, and § 3 of the 1863 Act became 31 U.S.C. § 3729 and prohibited presentation to the government of fraudulent claims by persons not in the military. The present language of the Act was adopted as part of the 1986 amendments, which were designed to enhance the ability of the government to "recover losses sustained as a result of fraud" against it in "federal programs and procurement." Senate Report at 1-2, reprinted in 1986 U.S.C.C.A.N. at 5266. Congress changed the language of § 3729(a) from "[a] person not a member of an armed force of the United States," 31 U.S.C. § 3729(a) (1982), to simply "[a]ny person." There was no suggestion in the Senate Report accompanying these amendments that the change was envisioned as broadening the class of persons who could be held liable under the Act; rather, that class was already viewed as all-encompassing. Thus, in a section describing the "history" of the FCA, the Report stated that
 
 
 63
 [t]he False Claims Act reaches all parties who may submit false claims. The term 'person' is used in its broad sense to include partnerships, associations, and corporations ... as well as States and political subdivisions thereof....
 
 
 64
 The False Claims Act is intended to reach all fraudulent attempts to cause the Government to pay out sums of money or to deliver property or services. Accordingly, a false claim may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms, specification, statute, or regulation.
 
 
 65
 Senate Report at 8-9, reprinted in 1986 U.S.C.C.A.N. at 5273-74 (emphasis added).
 
 
 66
 The 1986 amendments also added to the Act a provision for civil investigative demands (the "CID provision"), authorizing the Attorney General to issue written discovery demands as part of a "false claims law investigation." 31 U.S.C. § 3733(a)(1). The CID provision includes a set of definitions, see id. § 3733(l ), and under those definitions, "the term 'false claims law investigation' means any inquiry conducted ... for the purpose of ascertaining whether any person is engaged in any violation of a false claims law," id. § 3733(l )(2) (emphasis added); the term "false claims law" includes the FCA, see id. § 3733(l )(1); and "the term 'person' ... includ[es] any State or political subdivision of a State," id. § 3733(l )(4). Presumably, Congress would not have authorized such an investigation into whether States were engaged in violating the FCA unless States were among the "persons" who are suable under the Act.
 
 
 67
 The State contends that Congress included the CID provision's definitional language because it believed that States were not included previously. Such an inference is belied by, inter alia, the fact that the section also defines "person" to include "any natural person, partnership, corporation, [or] association," id. § 3733(l )(4), i.e., entities whom the FCA unquestionably had always reached. Nor could we reasonably impute such a belief to Congress in light of the fact that, as quoted above, the Senate Report described the FCA as historically reaching frauds by the States. We conclude that Congress's understanding prior to the adoption of the 1986 amendments "was that the False Claims Act applied to the States, and would, after the 1986 amendments, continue to apply to the States" as potential defendants. United States ex rel. Zissler v. Regents of the University of Minnesota, 154 F.3d 870, 874-75 (8th Cir.1998).
 
 
 68
 The State also argues that the treble damages and penalties for which the Act provides, see 31 U.S.C. § 3729(a), are punitive remedies that are not usually associated with suits against the States, and that we therefore should construe the Act as not authorizing such suits. We reject the State's premise. The 1863 Act provided for the recovery of double damages, see 1863 Act § 3, and those remedies have been held not to be punitive but remedial, multiple damages being recoverable in order "to make sure that the government would be made completely whole," United States ex rel. Marcus v. Hess, 317 U.S. at 551-52, 63 S.Ct. 379, in light of the need "to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims," United States v. Bornstein, 423 U.S. at 315, 96 S.Ct. 523. We see no impediment to Congress's applying this remedial structure against States who, in participating in federally funded programs, knowingly present fraudulent claims to the government.
 
 
 69
 In sum, we conclude that the term "[a]ny person" in § 3729(a) is sufficiently broad to encompass the States; that Congress meant to include the States within the term "person" in § 3730(b)(1), allowing them to bring suits under that section as qui tam plaintiffs; that there is no indication in the language or in the legislative history that Congress ascribed different meanings to the term "person" as used in §§ 3729(a), 3730(a), and 3730(b)(1); and that Congress intended the false-claims statutes to permit suits under §§ 3730(a) and 3730(b)(1) against any entity that presented false monetary claims to the government. We thus conclude that the present suit is authorized by the FCA.
 
 CONCLUSION
 
 70
 We have considered all of the State's arguments on this appeal and have found them to be without merit. The district court's order denying the State's motion to dismiss is affirmed.
 
 
 71
 WEINSTEIN, District Judge, dissenting.
 
 TABLE OF CONTENTS
 
 72
 I. INTRODUCTION.......................................................... 208
II. FACTS................................................................. 208
III. LAW................................................................... 209
 A. Eleventh Amendment............................................. 209
 1. Suits by Individuals........................................ 209
 a. Original Understanding................................ 210
 b. Broad Conception...................................... 211
 c. Limited Exceptions.................................... 212
 2. Suits by the United States.................................. 213
 a. Original Understanding................................ 213
 b. No Delegation......................................... 214
 B. Fundamental to Federalism...................................... 214
 1. Original Understanding...................................... 215
 2. Current Views............................................... 216
 3. Role of National Political Process.......................... 217
 C. Separation of Powers Challenges................................ 219
 1. Article II.................................................. 220
 2. Article III................................................. 220
IV. APPLICATION OF LAW TO FACTS........................................... 221
 A. Relator's Private Interest..................................... 221
 1. Real Party in Interest...................................... 221
 2. Statutory Protections....................................... 223
 B. Qui Tam Suits Measured Against Eleventh Amendment.............. 224
 C. Frustration of Appropriate Federal Dynamics.................... 225
 1. National Political Process.................................. 225
 2. Cooperative Relations Between Federal and State 226
 Administrative Agencies...................................
 3. Interference with Federal Government's Discretion to Sue or 228
 Refrain from Suing a State as a Distortion of Our Federal
 System....................................................
V. CONCLUSION............................................................ 229
 
 
 
 I
 INTRODUCTION
 
 
 I
 respectfully dissent from this decision approving a private qui tam federal court lawsuit against a state. In violation of the Eleventh Amendment, the result distorts the dynamics of our federal system, denigrates the traditional role of congresspersons as bridges between their state communities and the national executive branch, and undermines cooperative relationships between federal and state agencies
 II. FACTS
 In May 1995 Appellee, an attorney and former employee of Vermont's Agency of Natural Resources ("ANR"), brought this suit for treble damages and civil penalties against the State of Vermont under the qui tam provisions of the False Claims Act ("FCA"). The statute authorizes private parties to sue "for [themselves] and for the United States Government," 31 U.S.C. § 3730(b)(1), any "person" who submits a false or fraudulent demand for payment to the federal government. 31 U.S.C. § 3729(a).
 Appellee seeks twenty-five percent of the proceeds of the action as well as reimbursement for reasonable attorneys' fees, costs and expenses. He alleges that Vermont's use of pre-approved percentages of ANR employees' total work hours to account for time spent working on federally-funded projects, rather than actual hours worked, amounts to a fraud on the federal government.
 After Appellee filed his complaint under seal, 31 U.S.C. § 3730(b)(2), the United States conducted the requisite diligent investigation of his claims. 31 U.S.C. § 3730(a). This study continued for more than a year, as the government repeatedly was granted extensions of the original sixty-day investigation period provided for in the statute. 31 U.S.C. § 3730(b)(2), (3). Ultimately, the United States decided not to join in the action, leaving Appellee to exercise his statutory right to conduct the litigation against Vermont on his own. 31 U.S.C. § 3730(c)(3).
 Vermont moved to dismiss, arguing that Appellee's private lawsuit against the State for money damages was barred by the Eleventh Amendment. When the district court denied its motion, Vermont appealed under an exception to the Final Judgement Rule which permits states to appeal from a district court order denying a claim of Eleventh Amendment immunity. See, e.g., Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, 506 U.S. 139, 145-46, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993). Allowing an interlocutory appeal under the collateral order doctrine reflects "the importance of ensuring that the States' dignitary interests can be fully vindicated." Id. at 146, 113 S.Ct. 684.
 The United States then intervened for the limited purpose of filing a brief opposing Vermont's contention that this FCA suit violated the Eleventh Amendment.
 III. LAW
 
 
 A
 Eleventh Amendment
 
 
 [1]
 Suits by Individuals
 Adopted effective January 8, 1798 on demand of the states for protection, the Eleventh Amendment of the Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." Although the Amendment makes no explicit reference to sovereign immunity, it has consistently been interpreted to mean that a state, as a sovereign entity within our constitutional system, may not be sued by an individual--whether a citizen of that state, another state or a foreign country--in federal court without its consent. See, e.g., Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, ----, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997) ("To respect the broader concept of [sovereign] immunity, implicit in the Constitution, which we have regarded the Eleventh Amendment as evidencing and exemplifying, we have extended a State's protection from suit to suits by the State's own citizens."); Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) ("Absent waiver, neither a State nor agencies acting under its control may 'be subject to suit in federal court.' " (quoting Welch v. Texas Dept. of Highways and Pub. Transp., 483 U.S. 468, 480, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987))); Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ("this Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State"); Ex parte New York, 256 U.S. 490, 497, 41 S.Ct. 588, 65 L.Ed. 1057 (1921) ( "the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a state without consent given").
 Disapprobation of the doctrine of immunity, which interferes with "the duty of Government to render prompt justice against itself in favor of its citizens," Abraham Lincoln, first annual message to Congress, quoted in Clyde E. Jacobs, The Eleventh Amendment and Sovereign Immunity vii (1972), provides no warrant for ignoring a constitutional provision protecting the doctrine. Fortunately, widespread statutory waivers by federal and state governments permitting suits in their own courts have largely eroded this barrier to individual justice. Cf. id. at 5-8 (discussing exceptions in medieval England granting remedy to those wronged by the crown or its officers); id. at 151-164 (criticizing sovereign immunity as a denial of the rule of law); John v. Orth, The Judicial Power of the United States 154 (1987) (same). The Eleventh Amendment limits only suits brought in federal courts by individuals against states.
 a. Original Understanding
 There is no record of any discussion of state immunity at the Constitutional Convention. Nevertheless, federal courts' jurisdiction over suits by private citizens against states which had not consented to such litigation was disavowed by the framers of the Constitution during the pre-ratification debate over the meaning and scope of Article III.
 In response to concerns raised at Virginia's ratification convention that the Judiciary Article's provision for suits between a state and citizens of other states would subject the states to suits by individuals in federal court, Madison, our preeminent expert on the Constitution, declared:
 It is not in the power of individuals to call any State into Court. The only operation [the provision] can have, is, that if a State should wish to bring a suit against a citizen, it must be brought before the Federal Court.... It appears to me that this clause can have no operation but this--to give a citizen a right to be heard in the Federal Court, and if a State should condescend to be a party, this Court may take cognizance of it.
 
 
 [10]
 Documentary History of the Ratification of the Constitution 1414 (John P. Kaminski & Gaspare J. Saladino eds., 1993); see also (John Marshall), id. at 1433 ("I hope no Gentleman will think that a State will be called at the bar of the Federal Court.... It is not rational to suppose, that the sovereign power shall be dragged before a Court."). In New York, Hamilton responded to opponents of ratification in a similar vein:
 It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, [immunity] will remain with the States....
 The Federalist No. 81, at 487-88 (Clinton Rossiter ed., 1961).
 While these statements may be insufficient, standing alone, to establish the existence of a general consensus at the time of the ratification with regard to state sovereign immunity, they may well have played a significant role in securing the approval of the Constitution in those states where the states' amenability to suit by individuals in federal court was at issue. See Jackson Turner Main, The Antifederalists: Critics of the Constitution 157 (1961). That the states expected their immunity from private suits--at least those brought by noncitizens--to continue under the Constitution was soon made plain by their reaction to the Supreme Court's decision in Chisolm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), which held that Article III authorized federal jurisdiction over a suit by a South Carolina citizen against the state of Georgia. The response to Chisolm was so intense that it took only three weeks for both houses of Congress to approve the Eleventh Amendment, and it was promptly ratified. See Erwin Chemerinsky, Federal Jurisdiction § 7.2, at 374 (2d ed.1994); see also Richard H. Fallon et al., Hart and Wechsler's The Federal Courts and the Federal System 1048 (4th ed.1996).
 While many have speculated that the vigor of the states' reaction to Chisolm was due to their fear of a rash of lawsuits to collect unpaid Revolutionary War debts, see Chemerinsky, id. & n. 23, the reasons for the overwhelming support of the Eleventh Amendment were more complex. The Amendment was supported by both states' rights advocates and pro-creditor nationalists; assumption of the public debt under Hamilton's financial program had already alleviated much of the states' financial burdens arising from the War of Independence. See Clyde E. Jacobs, The Eleventh Amendment and Sovereign Immunity 70-74 (1972). Whatever the motives, the Amendment stands as a barrier to private suits against a state in federal court without the state's consent.
 It is well established that "[t]he Eleventh Amendment does not exist solely in order to preven[t] federal court judgments that must be paid out of a State's treasury." Seminole Tribe v. Florida, 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (internal quotation marks and citations omitted). The Amendment's "very object and purpose ... were to prevent the indignity of subjecting a state to the coercive process of judicial tribunals at the instance of private parties." In re Ayers, 123 U.S. 443, 505, 8 S.Ct. 164, 31 L.Ed. 216 (1887); see also Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, ----, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997) (immunity is designed to protect "the dignity and respect afforded a State"); Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) ("[The Amendment] accords the States the respect owed them as members of the federation.").
 b. Broad Conception
 The current broad conception of the Eleventh Amendment as the constitutional guarantor of state sovereign immunity is usually traced to the Supreme Court's decision in Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). See, e.g., Seminole Tribe v. Florida, 517 U.S. at 54, 116 S.Ct. 1114; Blatchford v. Native Village of Noatak, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991); see also Richard H. Fallon et al., Hart and Wechsler's The Federal Courts and the Federal System 1051 (4th ed.1996) ( "[T]here is no doubt that the decision marked a critical turning point, and that ever since, the Court has not adhered to a 'literal' reading of the Amendment in determining its effect on federal jurisdiction."). In Hans a Louisiana citizen and bondholder sued the State of Louisiana claiming that the state's adoption of a constitutional amendment prohibiting the payment of interest on its bonds violated the Contracts Clause of the Constitution. Acknowledging that the literal terms of the Eleventh Amendment did not apply to suits by in-state plaintiffs, Hans, 134 U.S. at 10, 10 S.Ct. 504, the Court nonetheless refused to limit the reach of the Amendment to its "letter." Id. at 15, 10 S.Ct. 504. In extending the states' immunity from suit beyond the text of the Amendment, the Court relied on the already quoted views of Madison, Hamilton and Marshall. See Part III.A.I.a., supra. It recalled the "shock of surprise," Hans, 134 U.S. at 11, 10 S.Ct. 504, arising from the Supreme Court's decision in Chilsolm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793):
 The letter is appealed to now, as it was then, as a ground for sustaining a suit brought by an individual against a state. The reason against it is as strong in this case as it was in that. It is an attempt to strain the constitution and the law to a construction never imagined or dreamed of.... Suppose that congress, when proposing the eleventh amendment, had appended to it a proviso that nothing therein contained should prevent a state from being sued by its own citizens in cases arising under the constitution or laws of the United States, can we imagine that it would have been adopted by the states? The supposition that it would is almost an absurdity on its face.
 Hans, 134 U.S. at 15, 10 S.Ct. 504.
 Criticism of the Hans Court's approach and its conception of a broad principle of sovereign immunity implicit in the constitutional design have been at the heart of much of the debate over the meaning and scope of the Eleventh Amendment. See, e.g., Seminole Tribe v. Florida, 517 U.S. 44, 84-93, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (Stevens, J., dissenting); id. at 116-85, 116 S.Ct. 1114 (Souter, J., dissenting); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 259302, 105 S.Ct. 3142, 87 L.Ed.2d 171 (Brennan, J., dissenting). As the Supreme Court noted recently, "[t]hese criticisms and proposed doctrinal revisions ... have not found acceptance with a majority of the Court." Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, ----, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997). On the contrary, a consistent course of Supreme Court decisions has reaffirmed the principle that the Eleventh Amendment functions as a constitutional limit on the jurisdictional grant contained in Article III. See, e .g., Idaho v. Coeur d'Alene Tribe, at ----, 117 S.Ct. at 2034 ("[E]leventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction."); Seminole Tribe, 517 U.S. at 63, 116 S.Ct. 1114 ("[T]he Eleventh Amendment st[ands] for the constitutional principle that state sovereign immunity limit[s] the federal courts' jurisdiction under Article III."); Atascadero State Hosp. v. Scanlon, 473 U.S. at 238, 105 S.Ct. 3142 ("[T]he significance of this Amendment 'lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III of the Constitution.' " (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Pennhurst II ))).
 c. Limited Exceptions
 In keeping with the broad and fundamental nature of state sovereign immunity, the Supreme Court has circumscribed necessary exceptions to the states' Eleventh Amendment guarantee of immunity. It has conceded that the states may explicitly waive their immunity and subject themselves to suit in federal court without violating the Eleventh Amendment. See Atascadero State Hosp. v. Scanlon, 473 U.S. at 238, 105 S.Ct. 3142 ("[I]f a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action."). A state's immunity will be deemed waived, however, "only where stated 'by the most the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.' " Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909)); see also Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 305-06, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) ( "solicitude for States' sovereign immunity" is basis for requirement that States' intent to waive immunity be clearly expressed).
 Suits by individuals against state officers to enjoin future violations of federal law are also permitted, under Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), even when compliance with the injunction might lead to the incidental expenditure of substantial state funds. See, e.g., Quern v. Jordan, 440 U.S. 332, 349, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (upholding order to send members of plaintiff's class notice of entitlement to administrative relief even though this could lead to monetary claims against the state since order was "more properly viewed as ancillary to the prospective relief already ordered by the court"); Milliken v. Bradley, 433 U.S. 267, 288-90, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (upholding school desegregation decree requiring state to pay half of costs associated with remedial educational programs for children subjected to past segregation); see also Patrick J. Barrett, Case Comment, Edward T. Young Still Living the Good Life: Coeur D'Alene Tribe v. Idaho, 73 Notre Dame L.Rev. 1077 (1998) (arguing that Supreme Court's recent decision in Coeur d'Alene Tribe does not curtail the ability of private plaintiffs to seek prospective relief from state officials in federal court under the doctrine of Ex parte Young ).
 The injunction exception does not encompass suits against state officers in their official capacities for retroactive relief to be payed from the state treasury since such litigations resemble suits for money damages against the state itself. See Edelman, 415 U.S. at 663, 94 S.Ct. 1347 ("[T]he rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."); Ford Motor Co. v. Department of the Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945) ("[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.").
 Any attempted abrogation by Congress of the states' Eleventh Amendment immunity is subject to two strict requirements. See, e.g., Seminole Tribe v. Florida, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 148 F.3d 1343, 1347 (Fed.Cir.1998). First, Congress must unequivocally express its intent to abrogate the immunity, a requirement which arises from "the Eleventh Amendment's role as an essential component of our constitutional structure." Dellmuth v. Muth, 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). See id. at 230, 109 S.Ct. 2397 ("[E]vidence of congressional intent [to abrogate] must be both unequivocal and textual."); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 246, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ("A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment."). Second, Congress' abrogation of sovereign immunity must be "pursuant to a valid exercise of power" under section five of the Fourteenth Amendment. See Seminole Tribe, 517 U.S. 44, 55, 65-66, 116 S.Ct. 1114, 134 L.Ed.2d 252. The Fourteenth Amendment warrants this distinction, the Seminole Tribe Court explained, because it was adopted "well after the adoption of the Eleventh Amendment and the ratification of the Constitution [and it] operated to alter the pre-existing balance between the state and federal power achieved by Article III and the Eleventh Amendment." Seminole Tribe, 517 U.S. 44, 65-66, 116 S.Ct. 1114, 134 L.Ed.2d 252; see also College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 148 F.3d 1343, 1352 (Fed.Cir.1998) ("When the states adopted the Fourteenth Amendment and consented to cede a portion of their authority to the federal government, it was within their contemplation that they limited their Eleventh Amendment immunity.")
 
 
 [2]
 Suits by the United States
 a. Original Understanding
 It is well settled that the states' Eleventh Amendment immunity does not extend to suits brought against them by the federal government. See, e.g., West Virginia v. United States, 479 U.S. 305, 311, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); United States v. Mississippi, 380 U.S. 128, 140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965) ("[N]othing in this or any other provision of the Constitution prevents or has ever been seriously supposed to prevent a State's being sued by the United States."); United States v. Minnesota, 270 U.S. 181, 195, 46 S.Ct. 298, 70 L.Ed. 539 (1926) ("[T]he immunity of the state is subject to the constitutional qualification that she may be sued in this Court by the United States...."); United States v. Texas, 143 U.S. 621, 645, 12 S.Ct. 488, 36 L.Ed. 285 (1892) ("It would be difficult to suggest any reason why this court should have jurisdiction to determine questions of boundary between two or more states, but not jurisdiction of controversies of like character between the United States and a state.").
 Suits by the United States against a state do not denigrate the dignity and respect owed the states in the way that suits by individuals do. "The submission to judicial solution of controversies arising between [the United States and a state], 'each sovereign, with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other,' ... but both subject to the supreme law of the land, does no violence to the inherent nature of sovereignty." United States v. Texas, 143 U.S. 621, 646, 12 S.Ct. 488, 36 L.Ed. 285 (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 410, 4 L.Ed. 579 (1819)).
 The possibility of suits by the United States against the states is essential to our federal system. Early on, the framers recognized that the power to enforce federal law against the states would be vital to the Union's stability. See Ralph Ketcham, James Madison: A Biography 113 (1971) ("[A]fter but twelve days of government under the Articles [of Confederation], Madison proposed an amendment containing fateful language: '... a general and implied power is vested in the United States in Congress assembled to enforce and carry into effect all the articles of the said Confederation against any of the States which shall refuse or neglect to abide by such determinations.' "). Justice Story regarded federal jurisdiction over suits to which the United States are a party as an absolute necessity: "Unless this power were given to the United States, the enforcement of all their rights, powers, contracts and privileges in their sovereign capacity would be at the mercy of the states." Joseph Story, Commentaries on the Constitution of the United States § 1674, at 445 (1851); see also United States v. Texas, 143 U.S. at 645, 12 S.Ct. 488 (lack of federal jurisdiction over controversies between the United States and a state could jeopardize the "permanence of the Union").
 The Supreme Court has consistently recognized that federal supremacy in areas allotted to the national government was implied in the abandonment of the preconstitutional federation of states. See Blatchford v. Native Village of Noatak, 501 U.S. 775, 785, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (states' consent to suit by the United States is "inherent in the [Constitutional] convention"); Principality of Monaco v. Mississippi, 292 U.S. 313, 329, 54 S.Ct. 745, 78 L.Ed. 1282 (1934) ("While ... jurisdiction over suits [by the United States against a state] is not conferred by the Constitution in express words, it is inherent in the constitutional plan."); United States v. Texas, 143 U.S. 621, 646, 12 S.Ct. 488, 36 L.Ed. 285 (1892) (consent to suit by the United States "was given by Texas when admitted into the Union upon an equal footing in all respects with the other states").
 b. No Delegation
 The federal government's power to sue a state is a narrow and nontransferable exception to the broad and fundamental constitutional principle of state sovereign immunity embodied in the Eleventh Amendment. The Supreme Court has rejected the argument that the federal government may delegate its authority to sue the states in federal court. In Blatchford v. Native Village of Noatak, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991), the Court indicated its disapproval of an Indian tribe's attempt to circumvent the requirements of the Eleventh Amendment by arguing that it could sue a state based on a delegation to it of the federal government's power to do so:
 [O]ur cases require Congress' exercise of the power to abrogate state sovereign immunity, where it exists, to be exercised with unmistakable clarity. To avoid that difficulty, respondent asserts that § 1362 represents not an abrogation of the State's sovereign immunity, but rather a delegation to tribes of the Federal Government's exemption from state sovereign immunity. We doubt, to begin with, that that sovereign exemption can be delegated--even if one limits the permissibility of delegation (as respondents propose) to persons on whose behalf the United States itself might sue. The consent, "inherent in the convention," to suit by the United States--at the instance and under the control of responsible federal officers--is not consent to suit by anyone whom the United States might select; and even consent to suit by the United States for a particular person's benefit is not consent to suit by that person himself.
 Blatchford v. Native Village of Noatak, 501 U.S. 775, 785, 111 S.Ct. 2578, 115 L.Ed.2d 686.
 B. Fundamental to Federalism
 The Supreme Court's generous, protective interpretation of the Eleventh Amendment reflects its recognition that the Amendment, as the constitutional repository of state sovereign immunity, is essential to the preservation of our federal system. See, e.g., Dellmuth v. Muth, 491 U.S. 223, 227, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) ("[A]brogation of sovereign immunity upsets the fundamental constitutional balance between the Federal Government and the States, placing considerable strain on the principles of federalism that inform Eleventh Amendment doctrine." (internal quotation marks and citations omitted)); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n. 2, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) ("Our Eleventh Amendment doctrine is necessary to support the view of the federal system held by the Framers of the Constitution...."); Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity."); Blatchford v. Native Village of Noatak, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) ("we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact"). Accordingly, any discussion of the Eleventh Amendment must take place within the larger context of our federalism and the constitutional balance it was designed to maintain.
 
 
 [1]
 Original Understanding
 Our federalism is dynamic, ensuring decentralization of power by maintaining an appropriate balance between the federal and state governments even as demands on these sovereignties change. See Richard H. Leach, American Federalism 59 (1970) ("[D]espite the inclusion of a 'more perfect Union' among the phrases describing the goals of American government in the ... Constitution, federalism is merely a means to be employed in achieving those goals.... Federalism remains process."); Carl J. Friedrich, Trends of Federalism in Theory and Practice 7 (1968) ("Federal relations are fluctuating relations in the very nature of things. Any federally organized community must therefore provide itself with instrumentalities for the recurrent revision of its pattern or design."). The founders were well aware that the creation of a system of government capable of fostering and safeguarding a process which would continuously balance centrifugal and centripetal forces was a necessary precondition of the Constitution's ratification and of its successful operation.
 In preparation for the Constitutional Convention, Madison had studied every federal system since ancient times. See Ralph Ketcham, James Madison: A Biography 183-85 (1971); Jack N. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution 43 (1996) ("[Madison] closed each section of his notes on this reading with a short but pointed list of the 'vices of the constitution' of the particular confederation he had just studied, the peculiar structural and political defects that compromised its strength and vigor."). Madison's experiences as a state legislator and federal representative had made him a proponent of a stronger national government than that afforded by the Articles of Confederation. See, e.g., id. at 36-46. His support for a strong national government, however, was well tempered by his belief in the importance of divided power. See Francis R. Greene, Madison's Views of Federalism in the Federalist, 24 Publius 47, 60 (1994) (characterizing Madison as "only a moderate nationalist, a supporter of energetic national government within a republican--and federal--framework"). In The Federalist Papers, both he and Hamilton emphasized the strong role the states were expected to play in the new federation. See The Federalist No. 9, at 76 (Hamilton) (Clinton Rossiter ed., 1961) ("The proposed Constitution, so far from implying abolition of the State governments, makes them constituent parts of the national sovereignty ... and leaves in their possession certain exclusive and very important portions of sovereign power."); The Federalist No. 17, at 120 (Madison) (Clinton Rossiter ed., 1961) (fact that states would be responsible for administration of civil and criminal justice would "render them at all times a complete counterpoise, and, not unfrequently, dangerous rivals to the power of the Union"); The Federalist No. 39, at 245 (Madison) (Clinton Rossiter ed., 1961) (jurisdiction of the national government "extends to certain enumerated objects only, and leaves to the several States a residuary and inviolable sovereignty over all other objects"); The Federalist No. 45, at 292 (Madison) (Clinton Rossiter ed., 1961) ("The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.").
 Madison's nationalism had been tempered in the Convention by the adoption of an equal state vote in the Senate. See Ralph Ketcham, James Madison: A Biography 303, 314 (1971). It was further modified by his subsequent experiences as a high federal official, president, and student of developments at the end of the 18th and early 19th centuries. See id. at 314 ("[Madison's] nationalism waned as he saw the federal impotence of the last days of the old confederation replaced by the sweeping national possibilities envisioned by [Hamilton's] Report on Public Credit. Separation and balance of powers seemed utterly lost."). During the 1790's, as Hamilton's Federalist party followed an increasingly centralized approach to public policy,
 Madison would join with Thomas Jefferson to champion diversity as an instrument superior to imposed national unity for the pursuit of the "common good," and he would seize upon a strict construction of constitutional grants of power to Congress as the bulwark of liberty in the face of what he viewed as outrageous transgressions.
 Harry N. Scheiber, Federalism and the Constitution: The Original Understanding, in American Law and the Constitutional Order 85, 97 (1978).
 Madison accurately predicted that far into the future states would predominate over the national government. The Federalist No. 46 (Madison) (Clinton Rossiter ed., 1961). The pre-Civil War discussion of nullification and interposition demonstrates the vehemence with which the supremacy of state sovereignty continued to be asserted more than half a century after adoption of the Constitution. See Ralph Ketcham, James Madison: A Biography 640-46 (1971). Until the outbreak of the Civil War, the states--each with "its own particular 'mix' of public policy ... and with its own set of rules in the establishment of priorities for economic development"--were the centers of power in many areas of importance. Harry Scheiber, Federalism and the American Economic Order, 1789-1910, Law and Soc'y (Fall 1975) 57, 97. See generally id. at 86-100 (discussing diffusion of power and decentralization of control over policy in the antebellum years).
 The subsequent expansion of central power resulted in part from ratification of the post-Civil War Amendments and the increasingly broad interpretation of the Commerce Clause and spending power in response to the growth of our national technological, economic and social systems. Nevertheless, even the Civil War, the Thirteenth, Fourteenth and Fifteenth Amendments, and enormous recent changes in our culture, did not alter our essential federal constitutional structure. See New York v. United States, 505 U.S. 144, 159, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("The actual scope of the Federal Government's authority with respect to the States has changed over the years ... but the constitutional structure underlying and limiting that authority has not.").
 In Texas v. White, 74 U.S. (7 Wall.) 700, 19 L.Ed. 227 (1868), decided the same year the Fourteenth Amendment was ratified, the Supreme Court famously declared:
 the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union composed of indestructible States.
 Id., 74 U.S. (7 Wall.) at 725. Well over a century later, the nation continues to adhere to the same principle of both state and national sovereignty.
 
 
 [2]
 Current Views
 The continuing potency of the states has recently been emphasized by the Supreme Court in a series of cases demonstrating an increased sensitivity to state independence. See, e.g., Printz v. United States, 521 U.S. 98, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (holding unconstitutional the enforcement provisions of the Brady Handgun Violence Prevention Act requiring local chief law enforcement officers to perform background checks on gun purchasers); id. at ----, 117 S.Ct. at 2383 ("[T]he whole object of the law [is] to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty .... It is the very principle of separate state sovereignty that such a law offends...."); Seminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding that the Eleventh Amendment bars Congress from using its power under the Indian Commerce Clause of Article I to expand the jurisdiction of the federal courts under Article III); id. at 72, 116 S.Ct. 1114 ("[W]e reconfirm that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government"); United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (holding that the Gun-Free School Zones Act exceeds Congress' power under the Commerce Clause); id. at 567, 115 S.Ct. 1624 ("To uphold the Government's contentions here ... would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States."); id. at 578, 115 S.Ct. 1624 ("[T]he federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far."); New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (holding unconstitutional "take-title" provision of the Low-Level Radioactive Waste Policy Amendments Act of 1985); id. at 178, 112 S.Ct. 2408 ("No matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate.").
 These decisions iterate with renewed vigor the system of "dual sovereignty" envisioned by the framers and established by the Constitution with the fundamental goal of preventing the expansion of state or federal governmental power at the expense of the liberty of individuals. See, e.g., New York v. United States, 505 U.S. 144, 181, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." (internal quotation marks and citation omitted)); Gregory v. Ashcroft, 501 U.S. 452, 458, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("[A] healthy balance of power between the States and the Federal Government will reduce the risk of tyranny from either front."); id. at 459, 111 S.Ct. 2395 ("In the tension between federal and state power lies the promise of liberty."). They recognize that our federal governmental structure affords its citizens increased liberty through increased political accountability. As the court stated in Lopez, "[t]he theory that two governments accord more liberty than one requires for its realization two distinct and discernible lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States." Lopez, 514 U.S. at 576, 115 S.Ct. 1624.
 
 
 [3]
 Role of National Political Process
 The framers envisioned from the outset the prominent role the political process would play in preventing the accumulation of national power at the expense of local interests. See James Thomas Flexner, The Young Hamilton 393 (1978) ("Hamilton and Madison responded [to objections to central power by Rhode Island in 1782] with arguments that presaged their defense of the eventual national Constitution in The Federalist. The security of general liberty lay not in clipping the wings of the central authority, but in frequent elections and rotation of offices that would keep the central power representative of all interests."). Madison's own experience as Virginia's representative under the Articles of Confederation gave him a first-hand practical appreciation for how federal representatives must balance their dual responsibilities to their state and to the nation. See Jack N. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution 38 (1996) ("The recurring need to balance national and state loyalties shaped the development of Madison's political thinking in important ways."). "The prepossessions, which the members [of Congress] themselves w[ould] carry into the federal government, w[ould] generally be favourable to the States." The Federalist No. 46, at 296 (Madison) (Clinton Rossiter ed., 1961). This was not only a background assumption of the constitutional plan, but a prerequisite for its successful functioning, which would depend on the assertion of a multiplicity of interests and points of view. See, e.g., The Federalist No. 10, at 83 (Madison) (Clinton Rossiter, ed., 1961) ("Extend the sphere and you take in a greater variety of parties and interests; you make it less probable that a majority of the whole will have a common motive to invade the rights of other citizens; or if such a motive exists, it will be more difficult for all who feel it to discover their own strength, and to act in unison with each other.").
 Scholars and commentators have identified a number of features of the national political process which serve to maintain the strong position of the states in the federal system. Some of these protective mechanisms, such as the Electoral College and the equal state vote in the Senate, are components of our formal, constitutional structure. See, e.g. Herbert Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum.L.Rev. 543, 558 (1954) (outlining the structural safeguards of federalism built into the Constitution and emphasizing "the role of the states in the composition and selection of the central government [as] intrinsically well adapted to retarding or restraining new intrusions by the center on the domain of the states"); Daniel J. Elazar, Federalism and Intergovernmental Relations in Cooperation and Conflict: Readings in American Federalism 9 (Daniel J. Elazar, et al. eds., 1969) ("[P]eople and their interests gain formal representation in the councils of government through their location in particular places and their ability to capture political control of territorial political units."); David L. Shapiro, Federalism: A Dialogue 116-117 (1995) (discussing the "significant structural reasons for the retention of state authority in so many areas of general importance" and the "built in role of the states in the administration of the central government").
 Other checks on the national power are nonstructural in nature. That is, they are rooted in the political process itself. See, e.g., Elizabeth Garrett, Enhancing the Political Safeguards of Federalism? The Unfunded Mandates Reform Act of 1995, 45 U.Kan.L.Rev. 1113, 1114 (1996) (discussing "possible safeguards of federalism that are truly political, giving due attention to political institutions, politicians and interest groups"); D. Bruce La Pierre, Political Accountability in the National Political Process--The Alternative to Judicial Review of Federalism Issues, 80 Nw.L.Rev. 577, 633 (1982) ( "[P]olitical checks and Congress' political accountability, and not simply the representation of state interests in Congress by representatives elected from the states, are the political safeguards of federalism."); Larry Kramer, Understanding Federalism, 47 Vand.L.Rev. 1485, 1520-47 (1994) (arguing that the political party system and extensive interactions between federal and state administrators play a particularly important role in protecting state autonomy).
 Despite the general effectiveness of these formal and informal mechanisms in protecting state interests, the potential for breakdowns in the political process exists. Such "process failures" threaten both the autonomy of the states and the representativeness of the national government itself. See Andrzej Rapaczynski, From Sovereignty to Process: The Jurisprudence of Federalism After Garcia, 1985 Sup.Ct.Rev. 341, 394. ("[I]n undermining the states, the federal government at the same time undercuts those very features of the national political process as a whole (on both the state and national level) on which its own health crucially depends."). The Supreme Court has rejected the idea that political safeguards are sufficient, in and of themselves, to protect the states against federal overreaching. See Printz v. United States, 521 U.S. 98, ---- - ----, 117 S.Ct. 2365, 2382-83, 138 L.Ed.2d 914 (1997); New York v. United States, 505 U.S. 144, 168-69, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); see also La Pierre, supra, at 665 ("[I]f Congress is not politically accountable, national statutes that intrude on state interests are not justified, and judicially imposed restrictions on Congress' powers are necessary to protect the states."). Rapaczynski, 1985 Sup.Ct.Rev. at 380-419 (analyzing political processes which serve to protect federalism and failures in those processes which may warrant judicial scrutiny). In both New York v.. United States, 505 U.S. at 168-69, 112 S.Ct. 2408, and Printz v. United States, at ---- - ----, 117 S.Ct. at 2382-83, the Court recognized that "process failures" had blurred the lines of political accountability between state and federal representatives to the detriment of our system of dual sovereignty. In New York v. United States the Court reasoned that "where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." New York v. United States, 505 U.S. at 169, 112 S.Ct. 2408. The Court's decision in Printz rested in part on a similar rationale:
 By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for "solving" problems without having to ask their constituents to pay higher taxes. And even when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects.
 Printz, at ----, 117 S.Ct. at 2382. While the federalism-based considerations permeating these decisions do not constitute an absolute restraint on congressional action, they do demonstrate the Court's reluctance to uphold federal legislation that distorts the balanced federal-state political process.
 Application of the FCA's qui tam provisions to the states interferes with the political process in ways which seriously undermine the position of the states vis-a-vis the federal government. As will be demonstrated in Part IV.C.3, infra, assigning the federal government's decision to sue a state to private qui tam plaintiffs--who are accountable to no one and motivated primarily by the hope of financial gain--prevents congresspersons from fulfilling their representative function of interceding on behalf of their home states in disputes with the federal government and interferes in the cooperative relationships between state agencies and their federal counterparts.
 C. Separation of Powers Challenges
 There is no need now to revisit case law upholding the constitutionality of the FCA's qui tam provisions in suits against private parties. See, e.g., United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1154 (2d Cir.1993), cert. denied, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993) (qui tam relators have standing to sue on the government's behalf even though they personally have not suffered actual or threatened injury); United States ex rel. Kelly v. Boeing Co., 9 F.3d 743 (9th Cir.1993), cert. denied, 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994) (FCA qui tam provisions do not violate Article III's standing requirements, the Appointments Clause, or separation of powers principles). Nevertheless, it should be noted that FCA qui tam suits stand on shaky constitutional ground with respect to the principle of separation of powers as embodied in Article II's Appointments and Take Care Clauses and Article III' § standing requirements.
 Policy considerations militating in favor of qui tam suits against non-state defendants may outweigh the serious separation of powers concerns these suits raise. A practical and flexible approach to modifying the lines separating powers of the three parts of federal government is necessary. The precise contours of the legislative, executive and judicial powers are not firmly fixed. The need for a workable and efficient system of government has created many areas of overlap between the governmental branches, a result which fully accords with the design of the framers, "practical statesmen, experienced in politics, who....saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." Buckley v. Valeo, 424 U.S. 1, 121, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); see also, e.g., Mistretta v. United States, 488 U.S. 361, 381, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("[T]he Framers did not require--and indeed rejected--the notion that the three Branches must be entirely separate and distinct."); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) ("While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government."); Hippocrates G. Apostle & Lloyd P. Gerson, [Commentaries to] Aristotle's Politics 324 (1986) ("There were, however, properly judicial functions which were in the hands of the Assembly, and also deliberative matters which were in the hands of officials. The three parts--deliberative, judicial and official--are to be understood broadly."); Jack B. Weinstein, Reform of Court Rule-Making Procedures 53-54 (1977) ("There has never been a fully compartmentalized separation of powers.... The rule-making power is one of the most important examples of practical necessity dictating that a twilight area be created where activities of the branches merge.").
 Policy considerations cannot, however override the Eleventh Amendment's flat prohibition of suits by private individuals against a state. In this context, the line between what is constitutionally permissible and what is not, is fairly clearly demarcated. The Eleventh Amendment prohibition is more analogous to the sharp age requirement of the presidency than it is to the vague standards of due process. Conflict with the constitutional principles embodied in the clear Eleventh Amendment doctrine as well as adverse practical federalism implications, provide a particularly powerful argument for declaring the False Claims Act's qui tam provisions as applied to states unconstitutional.
 
 
 [1]
 Article II
 By authorizing private individuals to conduct litigation on the government's behalf the FCA's qui tam procedures may violate the Appointments Clause of Article II of the Constitution, and may interfere with the President's explicitly stated constitutional duty to take care that the laws be faithfully executed. In Freytag v. Commissioner of Internal Revenue Service, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), the Supreme Court stated that "[its] separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch." Id. at 878, 111 S.Ct. 2631. The Court explained: "The Appointments Clause not only guards against this encroachment but also preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power. " Id. (emphasis added). The FCA arguably creates just such a diffusion of power by inviting private parties to prosecute suits on behalf of the national government to enforce United States policy, a function which may only constitutionally be performed by properly appointed officers of the United States under Article II. Moreover, FCA suits by qui tam relators may well "interfere impermissibly with [the President's] constitutional obligation to ensure the faithful execution of the laws," Morrison v. Olson, 487 U.S. 654, 693, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), by permitting relators' suits to go forward even where the government determines that the case merits neither a civil proceeding nor a criminal prosecution and by giving relators too much control over the conduct of the litigation in cases where the government declines to intervene. See generally, James T. Blanch, The Constitutionality of the False Claims Act's Qui Tam Provisions, 16 Harv. J.L. & Pub. Pol'y 701 (1993).
 
 
 [2]
 Article III
 Notwithstanding Second Circuit case law holding that a private relator has standing sufficient to comply with Article III in an action against a private party, see United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1154 (2d Cir.), cert. denied, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993), there remains some doubt whether a relator, who has no claim other than for a legal fee and compensation for bringing the action, has suffered the pre-suit "injury in fact" constitutionally required by Article III. Such an "injury in fact" must be to a pre-existing legally protected interest of the plaintiff "which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). Particularized "mean[s] that the injury must affect the plaintiff in a personal and individual way." Id. at 560 n. 1, 112 S.Ct. at 2136 n. 1.
 Before a qui tam suit is started a relator's injury is no greater than that of any taxpayer. Commencing the suit arguably should not be deemed a substitute for the already choate personalized "injury in fact" that is required for standing. See James T. Blanch, Note, The Constitutionality of the False Claims Act's Qui Tam Provisions, 16 Harv. J.L. & Pub. Pol'y 701, 714 (1993) (taxpayer injury insufficient for standing "is virtually indistinguishable from that suffered by FCA qui tam relators when their tax dollars go to fraudulent defense contractors"); see also Diamond v. Charles, 476 U.S. 54, 69-70, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (attorney's fees do not provide a sufficient stake in the litigation to confer standing). Compare United States ex rel. Riley v. St. Luke's Episcopal Hosp., 982 F.Supp. 1261, 1268 (S.D.Tex.1997) (qui tam plaintiff suffered no injury-in-fact as required by Article III and thus lacked standing) with United States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 748 (9th Cir.1993), cert. denied, 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994) (standing justified on the theory that FCA's qui tam provisions operate "as an enforceable unilateral contract").
 IV. APPLICATION OF LAW TO FACTS
 A. Relator's Private Interest
 
 
 [1]
 Real Party in Interest
 Assuming that under Kreindler alleged injury to the Government is sufficient to confer standing on a private relator, it is apparent that the United States is not the only real party in interest in this case. If the qui tam relator has standing on his own behalf, he must ipso facto be considered a real party in interest. See Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1154 (2d Cir.), cert. denied, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993) ("The qui tam plaintiff has the requisite personal stake in the outcome of the case to assure 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends.' " (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962))). As a constructive private party plaintiff, he should be barred from suing a state for money damages in a federal court under the Eleventh Amendment. See Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).
 Dubious is the suggestion that the relator simply "stands in the shoes of the government." Kreindler, 985 F.2d at 1154. As the definition of qui tam itself suggests, the interests the relator asserts in bringing suit under the FCA are very much his own as well as the government's. "Qui tam " is short for "qui tam pro domino rege quam pro si ipso in hac parte sequitur " which means "Who sues on behalf of the King as well as for himself. " See, e.g., Black's Law Dictionary 1190 (3d ed.1969) (emphasis added).
 A keen personal interest and pursuit of his own welfare on the part of the relator is a prerequisite for the successful functioning of the qui tam enforcement mechanism. The FCA was enacted in 1863 in an effort to stop the rampant fraud being perpetrated on the United States government by private Civil War defense contractors. See United States v. Bornstein, 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976); United States ex rel. Marcus v. Hess, 317 U.S. 537, 547, 551-52, 63 S.Ct. 379, 87 L.Ed. 443 (1943); see also James T. Blanch, The Constitutionality of the False Claims Act's Qui Tam Provisions, 16 Harv. J.L. & Pub. Pol'y 701, 705 n. 17 (1993) (" 'For sugar [the government] often got sand; for coffee, rye; for leather, something no better than brown paper; for sound horses and mules, spavined beasts and dying donkeys; and for serviceable muskets and pistols, the experimental failures of sanguine inventors, or the refuse of shops and foreign armories.' " (quoting 1 F. Shannon, The Organization and Administration of the Union Army, 1861-1865, at 58 (1965) (quoting Tomes, Fortunes of War, 29 Harpers Monthly 228 (1864)))).
 The Act established a dual enforcement mechanism, vesting primary responsibility for the investigation of violations in the Attorney General, but providing in addition for "qui tam " suits by private citizens on behalf of the United States for a portion of the proceeds of the action. See Act of March 2, 1863, 12 Stat. 696. These suits were designed to serve as an incentive for those who had previously engaged in fraudulent conduct to come forward and turn in their confederates. In the words of Senator Howard, the FCA's sponsor, "I have based [the provisions] on the old fashioned idea of holding out a temptation, and 'setting a rouge to catch a rogue,' which is the safest and most expeditious way I have ever discovered of bringing rogues to justice." See Cong. Globe, 37th Cong., 3d Sess. 955-56 (1863), quoted in Issues and Developments in Qui Tam Suits, in Citizen suits and Qui Tam Actions: Private Enforcement of Public Policy 119, 121 (1996). As the Supreme Court recently emphasized:
 [Qui tam statutes are] passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel.
 Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, ----, 117 S.Ct. 1871, 1877, 138 L.Ed.2d 135 (1997) (internal quotation marks and citations omitted) (emphasis added).
 The hope of gain held out to FCA qui tam relators is substantial. In 1986, motivated by widespread defense contracting fraud, Congress amended the Act to make qui tam suits both easier to bring and more financially lucrative. See John Phillips & Janet Goldstein, The False Claims Act in Practice 456 PLI/Lit 469, 474-79 (1993).
 Under the current version of the FCA, recovery by the government is for (1) a civil penalty of not less than $5000, and not more than $10,000, and (2) treble damages. See 31 U.S.C. § 3729(a). If the government chooses not to join in the action, as occurs in approximately 75 percent of cases filed, see Stuart M. Gerson, Issues and Developments in Qui Tam Suits, in Citizen Suits and Qui Tam Actions: Private Enforcement of Public Policy 119, 140 (1996), the relator stands to receive as much as 30 percent of the proceeds of the action or settlement in addition to reimbursement for reasonable expenses, attorneys' fees and costs. See 31 U.S.C. 1330(d)(1). Where the government does intervene, the relator may still be awarded up to 25% of the proceeds. See 31 U.S.C. 1330(d)(2).
 Federal qui tam suits have recently increased in both size and number. See Stuart M. Gerson, Issues and Developments in Qui Tam Suits under the False Claims Act, in Citizen Suits and Qui Tam Actions: Private Enforcement of Public Policy 119, 119 (National Legal Center for the Public Interest 1996). In the twelve years since the FCA Amendments' enactment, qui tam relators have earned approximately $244 million dollars. See Emily Barker, The Whistleblower Wanted More, American Lawyer, Sept. 1998, at 82, 85; see also Harvey Berkman, Spoils to Bounty Hunters, Federal Contractors Gripe, Nat'l L.J., March 4, 1996, at B1 ("The bounty has worked. To date, 153 relators have collected $188 million ."); John Phillips & Janet Goldstein, 456 PLI/Lit 469, 473 (1993) ( "Since the 1986 amendments were adopted, individuals have filed approximately 500 cases under the Act in federal courts around the country.").
 Rewards in the tens of millions have been reported in a single suit. See, e.g., Berkman, Nat'l L.J., March 4, 1996, at B1. The potential for huge recoveries has spawned the growth of a "qui tam bar" and a shift in emphasis from defense-contract cases to healthcare related ones involving fraudulent claims submitted to the Medicare and Medicaid programs. See, e.g., David J. Ryan, The False Claims Act: An Old Weapon with New Firepower is Aimed at Healthcare Fraud, 4 Annals Health L. 127 (1995); Kurt Eichenwald, Health Industry Seeks Congressional Relief, N.Y. Times, March 31, 1998, at D6.
 Qui tam plaintiffs' personal stake in the outcome of the litigation is independent of the interests of the United States. "As a class of plaintiffs," the Supreme Court has observed, "qui tam relators are different in kind than the Government. They are motivated primarily by prospects of monetary reward rather than the public good.... [They] are ... less likely than is the Government to forego an action arguably based on a mere technical noncompliance with reporting requirements that involved no harm to the public fisc." Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, ----, 117 S.Ct. 1871, 1877, 138 L.Ed.2d 135 (1997).
 The relator's and the Government's interests are sometimes in sharp conflict. The facts of United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp., 151 F.3d 1139 (9th Cir.1998), provide an example. The relators in that case were an orange processor and an orange grower who sued members of the citrus industry over alleged false statements made to the government in connection with a citrus marketing program. The United States, having concluded that the marketing program was unnecessarily divisive and should be abandoned, was forced to intervene in the action to have it dismissed over the relators' objections. See Emily Barker, The Whistleblower Wanted More, The American Lawyer, Sept. 1998, at 82 (detailing dispute between qui tam relator and federal government over size of relator's portion of $325 million settlement).
 
 
 [2]
 Statutory Protections
 Analysis of the language and structure of the False Claims Act confirms the view that the qui tam relator has a personal stake in a suit once begun, and that this stake is akin to a property right. Section 3730(b)(1) of the Act states that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b)(1) (emphasis added). According to the plain language of the statute, then, the relator's suit is brought partly on his own behalf.
 While section 3730(b)(1) provides that "[t]he action shall be brought in the name of the Government," id. (emphasis added), other provisions of the Act make it clear that once the suit is commenced, the "name" of the action is the only thing which belongs exclusively to the United States. For example, the relator may press the litigation without the approval of the government should it decide not to intervene. See 31 U.S.C. § 3730(c)(3). Moreover, the protective language of section 3730(c)(3) permits the government subsequently to intervene in the action, not as a matter of right, but only "upon a showing of good cause" and "without limiting the status and rights of the person initiating the action." 31 U.S.C. § 3730(c)(3).
 If the government does decide to intervene at the outset and assumes responsibility for prosecuting pursuant to section 3730(c)(1), the relator has the right to continue as a party. The government may not dismiss the suit without notifying the relator and affording him a hearing. See 31 U.S.C. § 3730(c)(1), (2)(A).
 Neither may the United States settle the suit without a hearing in which the court must determine that the proposed settlement is "fair, adequate, and reasonable under all the circumstances." 31 U .S.C. § 3730(c)(2)(B). At that hearing the court must take into account the needs of the relator and his counsel. See United States ex rel. Burr v. Blue Cross and Blue Shield of Florida, Inc. 882 F.Supp. 166, 167, 170 (M.D.Fla.1995); United States ex rel. McCoy v. California Med. Review, Inc., 133 F.R.D. 143, 148-49 (N.D.Cal.1990); County of Suffolk v. Long Island Lighting Co., 710 F.Supp. 1428, 1459, 1461 (E.D.N.Y.1989), rev'd on other grounds, 907 F.2d 1295 (1990).
 The government's inability to settle a qui tam action without the approval of the court may result in the continued prosecution of the suit by a relator, even when this runs counter to the government's interest-and the will of the states' congressional representatives. See, e.g., William P. Barr, Assistant Attorney General, Office of Legal Counsel, Memorandum to Dick Thornburgh, Attorney General, Re: Constitutionality of the Qui Tam Provisions of the False Claims Act, reprinted in Citizen Suits and Qui Tam actions: Private Enforcement of Public Policy 161, 172-73 (National Legal Center for the Public Interest 1996) (discussing case in which qui tam provisions permitted a relator to force a suit that the Department of Justice would have chosen not to pursue if the exercise of its prosecutorial discretion had not been undermined).
 The government is also prohibited from restricting the relator's right to participate in the case, for example by placing limitations on the number of witnesses and the length of their testimony, unless it satisfies the court that unlimited participation by the relator "would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment." 31 U.S.C. § 3730(c)(2)(C). This adherence to the fundamental due process rights of notice and an opportunity to be heard confers on the qui tam relator a vested interest in the nature of a property right once the suit is commenced.
 In sum, as both the rationale for the adoption of the FCA's qui tam provisions, and the provisions themselves demonstrate, once the standing issue is hurdled private plaintiffs bringing suit under the Act are vindicating interests of their own as well as of the government. The fact that the relator is joined with the government does not provide warrant for circumventing the constitutional barrier to an individual's suits against a state.
 B. Qui Tam Suits Measured Against Eleventh Amendment
 As a private party in interest suing a state for money damages, the relator can only be permitted to press his suit if he can establish Congress' clear intent under the Fourteenth Amendment to abrogate the states' Eleventh Amendment immunity. Seminole Tribe, 517 U.S. 44, 65-66, 116 S.Ct. 1114, 134 L.Ed.2d 252. See discussion Part III.A.1.c. supra. This a qui tam plaintiff cannot do.
 First, the language of the False Claims Act mentions neither the states' sovereign immunity nor the Eleventh or Fourteenth Amendments. The Act provides only that "[a]ny person" is subject to liability. 31 U.S.C. § 3729(a). The Supreme Court has repeatedly held that such general authorizations for suit in federal court are insufficient to abrogate the protections of the Eleventh Amendment. Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 246, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); see also Dellmuth v. Muth, 491 U.S. 223, 231, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) ("[I]mperfect confidence will not suffice given the special constitutional concerns in this area....").
 Even if Congress had made its intent to abrogate the states' immunity from private suit unmistakable in the language of the Act, this clear expression would fall short of overriding the Eleventh Amendment. The only authority recognized by the Supreme Court as a basis for abrogating state sovereign immunity is Section 5 of the Fourteenth Amendment. See Seminole Tribe, 517 U.S. 44, 59-66, 116 S.Ct. 1114, 134 L.Ed.2d 252; College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 148 F.3d 1343, 1348 (Fed.Cir.1998). The Fourteenth Amendment deals with such matters as civil rights and equal protection. It has never been put forward as support for the kind of qui tam action authorized by the FCA. Rather, the FCA was enacted under Article I of the Constitution. As the Court made clear in Seminole Tribe, "Article I cannot be used to circumvent the constitutional limits placed on federal jurisdiction." Seminole Tribe, 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252.
 Nor may the relator seek to bypass the requirements of the Eleventh Amendment by cloaking himself in the federal government's power to sue a state. As noted above, see Part III.A.2.b., supra, this exception is a narrow one. It does not carry over to the relator's suit simply by virtue of the fact that he is deemed a substitute for the United States for standing purposes. The theory that the qui tam relator has somehow been "deputized" as an agent of the United States through the language of the FCA ignores the fact that the relator does not sue under the auspices and control of the United States, but exercises his own statutory right to bring suit, see 31 U.S.C. § 3730(c)(1), (3), a right which is afforded procedural protections by specific provisions of the FCA.
 While the notion of a qui tam relator "standing in the shoes of" the United States may be sufficient to confer standing, it is not sufficient to effect a transfer of the federal government's exemption from state sovereign immunity. The government may be entitled to assign its claim to a relator, but its power to sue a state in federal court is nontransferable.
 C. Frustration of Appropriate Federal Dynamics
 Allowing private qui tam plaintiffs to sue a state impedes the successful functioning of our federal system. The federal government's decision to sue a state is a weighty one, requiring consideration not only of the suit's impact on federal-state relations and the taxpayers of the target state, but also its true cost to all United States citizens in terms of the allocation of scarce public resources. In such a context, the targeted state's congresspersons can often fulfill their representative role by using their influence with federal authorities to settle or dismiss the suit. The state's administrators must also have an opportunity to negotiate a resolution with their federal counterparts. Entrusting the United States' decision to sue a state to a qui tam relator, with an incentive to sue even when the merits of the suit are questionable, and even though its prosecution harms the interests of the federal government, the state, and the ongoing relationship between the two sovereigns, effectively short circuits the moderating processes afforded congresspersons and state and federal administrators.
 
 
 [1]
 National Political Process
 Local interests make themselves felt at all stages of the national political process. The election of senators and representatives from the states ensures the states' influential position as "strategic yardsticks for the measurement of interest and opinion, the special centers of political activity, the separate geographical determinants of national as well as local politics." Herbert Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum.L.Rev. 543, 546 (1954); see also, Larry Kramer, Understanding Federalism 47 Vand.L.Rev. 1485, 1547 (1994) ("The simple existence of independent states within the larger nation affects the dynamic of American politics ... by encouraging political movements to develop along state lines and to utilize the machinery of state government to achieve their goals."). Individual congresspersons' voting decisions are influenced by the preferences of their constituents and by the needs of their home states as well as by national interests. See generally, John W. Kingdon, Congressmen's Voting Decisions 29-71 (3d ed.1973); Warren E. Miller & Donald E. Stokes, Constituency Influence in Congress, 57 Am.Pol.Sci.Rev. 45 (1963).
 Members of Congress, in their individual capacity and as members of congressional committees, frequently intervene on behalf of their states and home communities to influence the policy positions and particular decisions of administrative agencies charged with implementing federal statutes. See generally Christopher J. Deering & Steven S. Smith, Committees in Congress, 58-123 (3d ed.1997); David E. Price, Congressional Committees in the Policy Process, in Congress Reconsidered 156 (Lawrence C. Dodd & Bruce I. Oppenheimer eds., 2d ed.1981); John A. Ferejohn & Charles R. Shipan, Congressional Influence on Bureaucracy, 6 J.L. Econ. & Org. 1 (1990).
 The often-used process by which federal representatives seek to influence the administrative discretion of the executive branch on behalf of their constituents, sometimes described as "casework," has become an integral part of American federalism. See John R. Johannes, To Serve the People: Congress and Constituency Service 4-5 (1984); T. Edward Westen, The Constituent Needs Help: Casework in the House of Representatives, in To Be a Congressman: The Promise and the Power 53, 54 (Sven Groennings & Jonathon P. Hawley eds., 1973) ("Casework is an indispensable function of a congressman."); Kenneth E. Gray, Congressional Interference in Administration, in Cooperation and Conflict: Readings in American Federalism 521, 521 (Daniel J. Elazar et al. eds., 1969) ("[I]nterference in administration on behalf of individuals, associations and state and local governments is a key characteristic of American federalism....").
 Congresspersons perform "casework" on behalf of both individuals and private groups. See generally Kenneth E. Gray, Congressional Interference in Administration, in Cooperation and Conflict: Readings in American Federalism 521, 523-540 (Daniel J. Elazar et al. eds., 1969). Requests for congressional intervention by industry groups and state or local governments are sometimes referred to as "high level" casework. See John R. Johannes, To Serve the People: Congress and Constituency Service 18 (1984); T. Edward Westen, The Constituent Needs Help: Casework in the House of Representatives, in To Be a Congressman: The Promise and the Power 53, 68 (Sven Groennings & Jonathon P. Hawley eds., 1973). In point of fact this "high level casework" is often, most importantly, conducted on behalf of state and municipal governments and their officials. These relationships are vital to the effective functioning of our interrelated layers of government. Congressional interventions in federal-state relationships often involve a more politically sophisticated portion of the constituency, affect larger numbers of people than casework requests by individuals, and are frequently given more personal attention by congresspersons and their staffs. Thus, "the kind of political delicacy that is needed in handling these problems requires that the person working with the cases be able to see policy implications and react to political realities." Id. at 70.
 From the point of view of state and local governments, "casework" is "a most useful device for gaining administrative consideration for state and local needs after legislation has been enacted and at the point where administrative discretion in statutory interpretation comes into play." Daniel J. Elazar, American Federalism: A View from the States 179 (3d ed.1984). The dependence of administrative agencies on members of Congress for funding and the approval of proposed legislation operates to the states' advantage and gives congresspersons great leverage. See Larry Kramer, Understanding Federalism 47 Vand.L.Rev. 1485, 1546 (1994) ("[F]ederal bureaucrats recognize the need to avoid alienating members of Congress, whose support they may need in the future, and this provides a significant degree of practical control."). Federal administrators, aware that future congressional support can hinge more on their ability to serve the interests of congresspersons and their constituents than on the details of a given program, can be very responsive to congresspersons' requests for intervention. See Daniel J. Elazar, American Federalism: A View from the States 179 (3d ed.1984).
 Congressional work on behalf of the home state and municipal interests plays a critical role in preserving the federal-state balance by "keeping the bureaucracy accountable and open to all the people and preserving decentralization of power in the American Federal System." Kenneth E. Gray, Congressional Interference in Administration, in Cooperation and Conflict: Readings in American Federalism 521, 542 (Daniel J. Elazar et al. eds., 1969).
 The federal administrators whose help is enlisted by congressional representatives for the purpose of preventing or facilitating administrative action gain influence from the process. Not only are potential mistakes avoided, but a quid pro quo relationship develops between congressional representatives and the administrative agencies they seek to influence. See Kenneth E. Gray, Congressional Interference in Administration, in Cooperation and Conflict: Readings in American Federalism 521, 541 (Daniel J. Elazar et al. eds., 1969) ("A favorable impression of an agency's responsiveness may enlist a valuable congressional ally. Favors done for congressmen may provide a receptive congressional ear to hear the agency's point of view in Congress.").
 
 
 [2]
 Cooperative Relations Between Federal and State
 Administrative Agencies
 The cooperative relationship that exists between the states and the federal government for the purpose of enforcing federal environmental laws has been described as one of "cooperative federalism." New York v. United States, 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); see also Karol L. Kahalley, State Sovereignty--Back to the Future: The Supreme Court Reaffirms State Sovereignty in Cooperative Federalism Solutions to Environmental Problems. New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), 29 Land & Water L.Rev. 117, 135 (1994). Under this scheme, federal environmental legislation and agency regulations set forth general policies and procedures which are designed for implementation and enforcement at the state level. See Alfred R. Light, He Who Pays the Piper Should Call the Tune: Dual Sovereignty in U.S. Environmental Law, 4 Envtl.Law. 779, 782 (1998). The system presupposes both a "national consensus ... as to the goals and objectives of environmental quality," and "a willingness on the part of states to be partners in the national enterprise." Id.; see also Arkansas v. Oklahoma, 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) ("The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters' " (quoting 33 U.S.C. § 1251(a))).
 The collaborative spirit which animates this sort of program has been aptly described:
 Uppermost in the attitudes of most federal and state officials involved in the cooperative programs is the sense of partnership in a common endeavor. This means that a federal official from a regional office charged with ensuring state compliance with federal regulations does not visit his state counterpart as an inspector but as a cooperator (the term is commonly used in the federal agencies).
 Daniel J. Elazar, American Federalism: A View from the States 182 (3d ed.1984).
 Federal officials have ample means at their disposal to ensure state agencies' compliance with federal standards. Reporting requirements and public records requests as well as constant monitoring, audits and reauthorizations combine to ensure the federal government access to the state agencies' records and operations. Moreover, where a state agency falls short of federal requirements, the federal bureaucracy often has the option of either withholding individual payments or cutting off funds altogether. See Karol L. Kahalley, State Sovereignty--Back to the Future: The Supreme Court Reaffirms State Sovereignty in Cooperative Federalism Solutions to Environmental Problems. New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), 29 Land & Water L.Rev. 117, 135-36 (1994) ("The federal government generally reserves the right to withdraw administration of these programs from states not meeting federal standards."). For example, if the recipient of a federal grant fails to comply with the terms of an award, the Environmental Protection Agency ("EPA") may withhold cash payment, disallow all or part of the cost of the program, suspend or terminate the award, or withhold further awards, among other remedies. 40 C.F.R. §§ 31.43, 31.51 (1996). Recipients of EPA grants must submit performance reports and financial reports to ensure compliance with federal awards. Id. §§ 31.40, 31.41. Under the Clean Water Act, the EPA is further required to evaluate recipient performance, id. § 35.150, and may reduce the amount of federal assistance if a recipient fails to meet performance standards. Id. § 35.43(b); see also 42 U.S.C. § 6926(e) (The Resource Recovery and Conservation Act) ("[w]henever the Administrator determines ... that a State is not administering and enforcing a program ... in accordance with requirements of this section, he shall so notify a State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw authorization of this program and establish a Federal program...."). Use of extreme measures by the federal bureaucracy to penalize a state is infrequent because of the realities of politics, and the need to avoid disaffection with federal officials.
 Because the federal authorities are hesitant about using harsh methods that might end or seriously weaken programs they are anxious to see maintained, the use of these formal mechanisms is avoided where possible through an emphasis on informal devices of consultation and persuasion. Federal officials seek cooperative compliance on the part of the states through such methods, knowing that such compliance is more effective in the long run. To develop this atmosphere of cooperation, they are prepared to make concessions to their state counterparts. In essence, formal mechanisms are used only as a last resort.
 Daniel J. Elazar, American Federalism: A View from the States 182 (3d ed.1984).
 State administrators cooperating with the federal bureaucracy are normally granted substantial flexibility with regard to program implementation. See id. at 184. Even when federal administrators require strict adherence to formal procedures,
 their state counterparts are frequently able to avoid further investigation by submitting the requisite formal documents applying for funds and accounting for their use in the approved manner. If the documents meet the requirements, no further investigations are conducted. The state agencies then go their own way in actually using the funds, having "bought" freedom from real supervision. As a general rule, the better established a program is, the less likely it is that federal administrators will exercise the supervisory powers that are legally theirs.
 Id.
 The important role played by these cooperative relationships in maintaining the federal-state balance should not be underestimated. See, e.g., id. at 3 (3d ed.1984) ("[f]ederalism is more than an arrangement of governmental structures; it is a mode of political activity that requires the extension of certain kinds of cooperative relationships throughout any political system it animates."); Larry Kramer, Understanding Federalism, 47 Vand.L.Rev. 1485, 1543 (1994) (federal-state administrative structure "plays an important, and underappreciated, supporting role in federalism"). Dependence of the federal government on the states for the implementation and enforcement of whole bodies of federal law ensures that state institutions will be able to exert influence:
 The federal government needs the states as much as the reverse, and this mutual dependency guarantees state officials a voice in the process. Not necessarily an equal voice: because federal law is supreme and Congress holds the purse strings, the federal government is bound to prevail if push comes to shove. But federal dependency on state administrators gives federal officials an incentive to see that push doesn't come to shove, or at least that this happens as seldom as possible, and that means taking state interests into account.
 Id. at 1544.
 
 
 [3]
 Interference with Federal Government's Discretion to Sue
 or Refrain from Suing a State as a Distortion of
 Our Federal System
 Given the implications of a government suit against a state, the full freedom of congressional representatives to attempt to resolve the underlying dispute is of critical importance. In a qui tam suit against a state, however, congressional representatives are prevented from using their influence by specific provisions of the False Claims Act.
 During the first phase of a qui tam action, the complaint remains under seal for sixty days while the government decides whether or not to intervene. See 31 U.S.C. § 3730(b)(2). Unless officials of the targeted state somehow learn of the initiation of a lawsuit during this period and communicate their knowledge to the state's federal representatives, congressional interference at this stage will not be possible.
 Should the government decide not to intervene in the relator's suit during this period, its loss of control over the litigation will make it difficult, if not impossible, to respond to pressure from congressional representatives seeking settlement or dismissal of the suit. The provisions of the Act which protect the relator's interest in the litigation ensure that congresspersons' efforts on behalf of their state will have little practical effect. Even where the government agrees that the suit should be dismissed, it must establish "good cause" for subsequent intervention in an action it has initially chosen not to pursue. See 31 U.S.C. § 3730(c)(3). As noted in Part IV.A.2., supra, section 3730(c)(2)(A) requires that the qui tam relator be given notice and a hearing before the case can be dismissed, and section 3730(c)(2)(B) provides that the government may settle a suit only "if the court determines after a hearing, that the proposed settlement is fair, adequate and reasonable under all the circumstances." 31 U.S.C. § 3730(c)(2)(B). It is also worth noting that, even where the United States surmounts the "good cause" hurdle and succeeds in settling the suit or having it dismissed, a substantial amount of damage will already have been done. Not only will the state have been subjected to suit in federal court at the hands of a private citizen, it will, in all likelihood, have expended considerable amounts of public money in defending a possibly meritless lawsuit. Either way, the result will be a violation of both the Eleventh Amendment and the spirit of our federalism which it embodies.
 In the instant case, the relator's suit remained under seal for over a year. During that period the time for the action to remain secret had been repeatedly extended. From the initiation of this action until almost the present time, Vermont's federal representatives were presumably either in the dark as to the existence of the action, or, if not, prevented by the structure of the Act from bringing their full political influence to bear on the controversy. That is an especially dangerous state of affairs from the point of view of our federal system.
 The destructive potential of this type of litigation with regard to the cooperative relationship between state agencies and their federal counterparts should also be apparent. The relator's suit challenging the accounting procedures used by Vermont's Department of Environmental Conservation ("DEC") to draw down federal grants from the EPA drives a wedge between the two agencies, inhibiting a productive, collaborative partnership, generating suspicion and turning what should be a cooperative relationship into a strained and awkward one. Disputes like this one, which involve a difference of interpretation with regard to proper accounting practice, are particularly amenable to congressional legislative resolution or mediation by congresspersons. What may be an effective formal mechanism for policing the adversarial relationship between the government and a defense contractor or private health agency filing a claim for payment can destroy a constitutionally appropriate collaborative interaction between the federal government and a state acting in concert to implement the nation's environmental or other statutes. In this case, the United States had extensive access to DEC records and ample means with which to procure the DEC's compliance had it been dissatisfied with the agency's accounting procedures, or with any other aspect of its performance.
 In short, the government's lack of full control over the course of the litigation undermines the ability of federal congressional representatives--and of governors, mayors and other local representatives as well--to use the legitimate political process of our federalism to influence the discretionary decisions of the Executive Branch in favor of state interests. The result is the frustration of the complex and sophisticated process of influence and negotiation that plays an integral part in the work of our current federal system. Limited too, are the opportunities for state administrative agencies effectively to assert state interests in the labyrinthine corridors of the federal bureaucracy. The serious distortion of the dynamics of our federal system raises concerns similar to those which led the Supreme Court to invalidate the legislation at issue in Printz v. United States, 521 U.S. 98, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) and New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Here, as in those cases, "the Constitution protects us from our own best intentions." Id. at 187, 112 S.Ct. 2408.
 V. CONCLUSION
 Because the False Claims Act fails plainly to state Congress' design under the Fourteenth Amendment to abrogate the states' sovereign immunity, because destruction of the states' sovereign immunity by the qui tam provisions of the False Claims Act unnecessarily upsets a cooperative process essential to American federalism, and because Appellee's suit against the State of Vermont is barred by the Eleventh Amendment, this qui tam action against the State of Vermont should be dismissed. However rational and desirable this form of qui tam action may be to protect the federal fisc, it is barred by the Constitution.
 
 
 *
 Honorable Jack B. Weinstein, of the United States District Court for the Eastern District of New York, sitting by designation